# MORGAN *v.* ILLINOIS

No. 91–5118.   Argued January 21, 1992—Decided June 15, 1992

720

WHITE, J., delivered the opinion of the Court, in which BLACKMUN, STEVENS, O'CONNOR, KENNEDY, and SOUTER, JJ., joined. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., and THOMAS, J., joined, *post*, p. 739.

*Allen H. Andrews III* argued the cause and filed briefs for petitioner.

*Kenneth L. Gillis* argued the cause for respondent. With him on the brief were *Roland W. Burris,* Attorney General of Illinois, *Terence M. Madsen,* Assistant Attorney General,

Jack O'Malley, Randall E. Roberts, Sally L. Dilgart, William D. Carroll, and Marie Quinlivan Czech.*

JUSTICE WHITE delivered the opinion of the Court.

We decide here whether, during *voir dire* for a capital offense, a state trial court may, consistent with the Due Process Clause of the Fourteenth Amendment, refuse inquiry into whether a potential juror would automatically impose the death penalty upon conviction of the defendant.

## I

The trial of a capital offense in Illinois is conducted in two phases. The defendant must first be convicted of first-degree murder, as defined in Ill. Rev. Stat., ch. 38, ¶ 9–1(a) (Supp. 1990). Illinois law uses the same jury that decided guilt to determine whether the death penalty shall be imposed,[1] and upon conviction, a separate sentencing hearing commences to determine the existence of aggravating and mitigating factors. ¶ 9–1(d)(1). To be eligible for the death penalty, the jury must find unanimously, ¶ 9–1(g), and beyond a reasonable doubt, ¶ 9–1(f), that the defendant was at least 18 years old at the time of the murder, and that at least 1 of 10 enumerated aggravating factors exists, ¶ 9–1(b). See, e. g., ¶ 9–1(b)(5) (murder for hire or by contract); ¶ 9–1(b)(10) (premeditated murder by preconceived plan). If the jury finds none of the statutory aggravating factors to exist, the defendant is sentenced to a term of imprisonment. ¶ 9–1(g). "If there is a unanimous finding by the jury that one or more

---

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union et al. by *Robert L. Graham, Laura A. Kaster, Harvey Grossman, John A. Powell, Steven Shapiro,* and *Diann Rust-Tierney;* and for the National Association of Criminal Defense Lawyers by *Andrea D. Lyon.*

[1] The defendant may, however, elect to waive sentencing by the jury. Ill. Rev. Stat., ch. 38, ¶ 9–1(d)(3) (Supp. 1990). The procedure and standards that guide a sentencing judge, ¶ 9–1(h), are identical to those that guide a jury, ¶ 9–1(g).

of the factors set forth in subsection (b) exist, the jury shall consider aggravating and mitigating factors as instructed by the court and shall determine whether the sentence of death shall be imposed." *Ibid.* As part of this balance, the jury is instructed to consider mitigating factors existing in the case, five of which are enumerated, but which are not exclusive. ¶ 9–1(c). The State may also present evidence of relevant aggravating factors beyond those enumerated by statute. *Ibid.* "If the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death." ¶ 9–1(g).

Petitioner Derrick Morgan was convicted in Cook County, Illinois, of first-degree murder and sentenced to death. The evidence at trial amply proved that petitioner was hired to kill a narcotics dealer apparently competing with the El Rukns, one of Chicago's violent inner-city gangs. For $4,000, petitioner lured the dealer, who was a friend, into an abandoned apartment and shot him in the head six times. Upon consideration of factors in aggravation and mitigation, the jury sentenced him to death.

Three separate venires were required to be called before the jury was finally chosen. In accordance with Illinois law, the trial court, rather than the attorneys, conducted *voir dire. People* v. *Gacy,* 103 Ill. 2d 1, 36–37, 468 N. E. 2d 1171, 1184–1185 (1984). The State, having elected to pursue capital punishment, requested inquiry permitted by *Witherspoon* v. *Illinois,* 391 U. S. 510 (1968), to determine whether any potential juror would in all instances refuse to impose the death penalty upon conviction of the offense. Accordingly, the trial court, over opposition from the defense, questioned each venire whether any member had moral or religious principles so strong that he or she could not impose the death penalty "regardless of the facts." App. 9, 78, 90. Seventeen potential jurors were excused when they ex-

pressed substantial doubts about their ability to follow Illinois law in deciding whether to impose a sentence of death. *Id.*, at 9–22, 79–83, 90–94. All of the jurors eventually empaneled were also questioned individually under *Witherspoon*, each receiving and responding in the negative to this question or a slight variation: "Would you automatically vote against the death penalty no matter what the facts of the case were?" App. 33; see *id.*, at 36, 41, 48, 55, 59, 64, 69, 76, 88, 97, 103.

After seven members of the first venire had been questioned, including three who eventually became jurors, petitioner's counsel requested the trial court to ask all prospective jurors the following question: "If you found Derrick Morgan guilty, would you automatically vote to impose the death penalty no matter what the facts are?" *Id.*, at 44. The trial court refused this request, stating that it had "asked the question in a different vein substantially in that nature." *Ibid.*

Prior to the *voir dire* of the three venires, the trial court had explained in general terms the dictates of Illinois procedure in capital trials, as outlined above. See *id.*, at 24, 77–78, 90. During *voir dire*, the trial court received from 9 of the 12 jurors empaneled an affirmative response to variations of this question: "Would you follow my instructions on the law even though you may not agree?" *Id.*, at 30; see *id.*, at 38, 43, 49, 56, 60, 64, 69, 107. However, the trial court did not ask three of the jurors this question in any way. See *id.*, at 73–77, 83–89, 94–100. Every juror eventually empaneled was asked generally whether each could be fair and impartial.[2] Each juror responded appropriately to at least one

---

[2] Such questioning led to the removal for cause of one prospective juror, following this exchange:

"Q Would you follow my instructions on the law in the case even though you might not agree?

"A Yes.

of these questions, or a variation: (1) "Do you know of any reason why you cannot be fair and impartial?", *id.*, at 33; see *id.*, at 41, 49, 64, 68, 75, 88, 99; (2) "Do you feel you can give both sides a fair trial?", *id.*, at 70; see *id.*, at 35, 38, 43, 49, 56, 61, 65, 77, 100, 110. When empaneled, each member of the jury further swore an oath to "well and truly try the issues joined herein and true deliverance make between the People of the State of Illinois and the defendant at the bar and a true verdict render according to the law and the evidence." 1 Tr. 601–602; see *id.*, at 264, 370, 429, 507, 544, 575–576.

On appeal, the Illinois Supreme Court affirmed petitioner's conviction and death sentence, rejecting petitioner's claim that, pursuant to *Ross* v. *Oklahoma*, 487 U. S. 81 (1988), *voir dire* must include the "life qualifying" or "reverse-*Witherspoon*" question upon request. The Illinois Supreme Court concluded that nothing requires a trial court to question potential jurors so as to identify and exclude any who would vote for the death penalty in every case after conviction for a capital offense. 142 Ill. 2d 410, 470, 568 N. E. 2d 755, 778 (1991).[3] That court also found no violation

"Q Do you know any reason why you cannot give this defendant a fair trial?

"A I would have no problem during the trial. If it came—I had a friend's parents murdered twelve years ago before capital punishment. I would give a fair trial. If he is found guilty, I would want him hung.

"Q You couldn't be fair and impartial throughout the proceedings?

"A No.

"Q You are excused." App. 72–73.

[3] The Illinois Supreme Court has subsequently emphasized that decision in this case was not meant "to imply that the 'reverse-*Witherspoon*' question is inappropriate. Indeed, given the type of scrutiny capital cases receive on review, one would think trial courts would go out of their way to afford a defendant every possible safeguard. The 'reverse-*Witherspoon*' question may not be the only means of ensuring defendant an impartial jury, but it is certainly the most direct. The best way to ensure that a prospective juror would not automatically vote for the death penalty is to ask." *People* v. *Jackson,* 145 Ill. 2d 43, 110, 582 N. E. 2d

of *Ross*, concluding instead that petitioner's jury "was selected from a fair cross-section of the community, each juror swore to uphold the law regardless of his or her personal feelings, and no juror expressed any views that would call his or her impartiality into question." 142 Ill. 2d, at 470, 568 N. E. 2d, at 778.

We granted certiorari because of the considerable disagreement among state courts of last resort on the question at issue in this case.[4] 502 U. S. 905 (1991). We now reverse the judgment of the Illinois Supreme Court.

## II

We have emphasized previously that there is not "any one right way for a State to set up its capital sentencing

---

125, 156 (1991). See also *State* v. *Atkins*, 303 S. C. 214, 222–223, 399 S. E. 2d 760, 765 (1990).

[4] Delaware and South Carolina agree with Illinois that the "reverse-*Witherspoon*" inquiry is unnecessary so long as, by questions and oath, each juror swears to be fair and impartial and to follow the law. See *Riley* v. *State*, 585 A. 2d 719, 725–726 (Del. 1990), cert. denied, 501 U. S. 1223 (1991); *State* v. *Hyman*, 276 S. C. 559, 563, 281 S. E. 2d 209, 211–212 (1981), cert. denied, 458 U. S. 1122 (1982). Missouri appears to be of this view as well. *State* v. *McMillin*, 783 S. W. 2d 82, 94 (Mo.), cert. denied, 498 U. S. 881 (1990). California, Georgia, Louisiana, New Jersey, North Carolina, Utah, and Virginia disagree, see *People* v. *Bittaker*, 48 Cal. 3d 1046, 1083–1084, 774 P. 2d 659, 679 (1989); *Skipper* v. *State*, 257 Ga. 802, 806–807, 364 S. E. 2d 835, 839 (1988); *State* v. *Henry*, 196 La. 217, 232–234, 198 So. 910, 914–916 (1940); *State* v. *Williams*, 113 N. J. 393, 415–417, 550 A. 2d 1172, 1182–1184 (1988); *State* v. *Rogers*, 316 N. C. 203, 216–218, 341 S. E. 2d 713, 722 (1986); *State* v. *Norton*, 675 P. 2d 577, 588–589 (Utah 1983), cert. denied, 466 U. S. 942 (1984); *Patterson* v. *Commonwealth*, 222 Va. 653, 657–660, 283 S. E. 2d 212, 214–216 (1981), as apparently do Arkansas, Florida, and Kentucky, see *Pickens* v. *State*, 292 Ark. 362, 366–367, 730 S. W. 2d 230, 233–234, cert. denied, 484 U. S. 917 (1987); *Gore* v. *State*, 475 So. 2d 1205, 1206–1208 (Fla. 1985), cert. denied, 475 U. S. 1031 (1986); *Morris* v. *Commonwealth*, 766 S. W. 2d 58, 60 (Ky. 1989). Lower courts in Alabama also follow this latter view. See *Bracewell* v. *State*, 506 So. 2d 354, 358 (Ala. Crim. App. 1986); cf. *Henderson* v. *State*, 583 So. 2d 276, 283–284 (Ala. Crim. App. 1990) (no "plain error" in trial court's failure *sua sponte* to "life qualify" the prospective jurors), aff'd, 583 So. 2d 305 (1991).

scheme," *Spaziano* v. *Florida*, 468 U. S. 447, 464 (1984) (citations omitted), and that no State is constitutionally required by the Sixth Amendment or otherwise to provide for jury determination of whether the death penalty shall be imposed on a capital defendant, *ibid.* Illinois has chosen, however, to delegate to the jury this task in the penalty phase of capital trials in addition to its duty to determine guilt or innocence of the underlying crime. The issue, therefore, is whether petitioner is entitled to relief under the Due Process Clause of the Fourteenth Amendment. We conclude that he is, and in the course of doing so we deal with four issues: whether a jury provided to a capital defendant at the sentencing phase must be impartial; whether such defendant is entitled to challenge for cause and have removed on the ground of bias a prospective juror who will automatically vote for the death penalty irrespective of the facts or the trial court's instructions of law; whether on *voir dire* the court must, on defendant's request, inquire into the prospective jurors' views on capital punishment; and whether the *voir dire* in this case was constitutionally sufficient.

A

*Duncan* v. *Louisiana*, 391 U. S. 145 (1968), held that the Fourteenth Amendment guaranteed a right of jury trial in all state criminal cases which, were they tried in a federal court, would come within the Sixth Amendment's guarantee of trial by jury. Prior to this decision applying the Sixth Amendment's jury trial provision to the States, we recognized in *Irvin* v. *Dowd*, 366 U. S. 717 (1961), and in *Turner* v. *Louisiana*, 379 U. S. 466 (1965), that the Fourteenth Amendment's Due Process Clause itself independently required the impartiality of any jury empaneled to try a cause:

> "Although this Court has said that the Fourteenth Amendment does not demand the use of jury trials in a State's criminal procedure, *Fay* v. *New York*, 332 U. S. 261 [(1947)]; *Palko* v. *Connecticut*, 302 U. S. 319 [(1937)],

every State has constitutionally provided trial by jury. See Columbia University Legislative Drafting Research Fund, Index Digest of State Constitutions, 578–579 (1959). In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. *In re Oliver*, 333 U. S. 257 [(1948)]; *Tumey* v. *Ohio*, 273 U. S. 510 [(1927)]. 'A fair trial in a fair tribunal is a basic requirement of due process.' *In re Murchison*, 349 U. S. 133, 136 [(1955)]. In the ultimate analysis, only the jury can strip a man of his liberty or his life. In the language of Lord Coke, a juror must be as 'indifferent as he stands unsworne.' Co. Litt. 155b. His verdict must be based upon the evidence developed at the trial. Cf. *Thompson* v. *City of Louisville*, 362 U. S. 199 [(1960)]. This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies. It was so written into our law as early as 1807 by Chief Justice Marshall in 1 Burr's Trial 416 (1807). 'The theory of the law is that a juror who has formed an opinion cannot be impartial.' *Reynolds* v. *United States*, 98 U. S. 145, 155 [(1879)]." *Irvin* v. *Dowd, supra*, at 721–722 (footnote omitted).

In *Turner* v. *Louisiana*, we relied on this passage to delineate "the nature of the jury trial which the Fourteenth Amendment commands when trial by jury is what the State has purported to accord." 379 U. S., at 471. In short, as reflected in the passage above, due process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment. *Id.,* at 472, and n. 10; cf. *Groppi* v. *Wisconsin*, 400 U. S. 505, 508–511 (1971).

Thus it is that our decisions dealing with capital sentencing juries and presenting issues most analogous to that which we decide here today, *e. g., Witherspoon* v. *Illinois,* 391 U. S., at 518; *Adams* v. *Texas,* 448 U. S. 38, 40 (1980); *Wainwright* v. *Witt,* 469 U. S. 412, 423 (1985); *Ross* v. *Oklahoma,* 487 U. S., at 85, have relied on the strictures dictated by the Sixth *and* Fourteenth Amendments to ensure the impartiality of any jury that will undertake capital sentencing. See also *Turner* v. *Murray,* 476 U. S. 28, 36, and n. 9 (1986) (plurality opinion).

## B

*Witt* held that "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" 469 U. S., at 424 (quoting *Adams* v. *Texas, supra,* at 45). Under this standard, it is clear from *Witt* and *Adams,* the progeny of *Witherspoon,* that a juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause.

Thereafter, in *Ross* v. *Oklahoma, supra,* a state trial court refused to remove for cause a juror who declared he would vote to impose death automatically if the jury found the defendant guilty. That juror, however, was removed by the defendant's use of a peremptory challenge, and for that reason the death sentence could be affirmed. But in the course of reaching this result, we announced our considered view that because the Constitution guarantees a defendant on trial for his life the right to an impartial jury, 487 U. S., at 85, the trial court's failure to remove the juror for cause was constitutional error under the standard enunciated in *Witt.* We emphasized that "[h]ad [this juror] sat on the jury that ultimately sentenced petitioner to death, and had petitioner properly preserved his right to challenge the trial court's

failure to remove [the juror] for cause, the sentence would have to be overturned." 487 U. S., at 85 (citing *Adams, supra*).

We reiterate this view today. A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views. If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence.

## C

Illinois, in fact, raises no challenge to the foregoing precepts, but argues instead that the trial court, in its discretion, may refuse direct inquiry into this matter, so long as its other questioning purports to assure the defendant a fair and impartial jury able to follow the law. It is true that "[v]oir dire 'is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.'" *Ristaino* v. *Ross,* 424 U. S. 589, 594 (1976) (quoting *Connors* v. *United States,* 158 U. S. 408, 413 (1895)). The Constitution, after all, does not dictate a catechism for *voir dire,* but only that the defendant be afforded an impartial jury. Even so, part of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors. *Dennis* v. *United States,* 339 U. S. 162, 171–172 (1950); *Morford* v. *United States,* 339 U. S. 258, 259 (1950). "*Voir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate *voir dire* the

trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales-Lopez* v. *United States*, 451 U. S. 182, 188 (1981) (plurality opinion). Hence, "[t]he exercise of [the trial court's] discretion, and the restriction upon inquiries at the request of counsel, [are] subject to the essential demands of fairness." *Aldridge* v. *United States*, 283 U. S. 308, 310 (1931).[5]

The adequacy of *voir dire* is not easily the subject of appellate review, *Rosales-Lopez, supra,* at 188, but we have not hesitated, particularly in capital cases, to find that certain inquiries must be made to effectuate constitutional protections, see, *e. g., Turner* v. *Murray, supra,* at 36–37; *Ham* v. *South Carolina,* 409 U. S. 524, 526–527 (1973). Our holding in *Ham,* for instance, was as follows:

> "Since one of the purposes of the Due Process Clause of the Fourteenth Amendment is to insure these 'essential demands of fairness,' *e. g., Lisenba* v. *California,* 314 U. S. 219, 236 (1941), and since a principal purpose of the adoption of the Fourteenth Amendment was to prohibit the States from invidiously discriminating on the basis of race, *Slaughter-House Cases,* 16 Wall. 36, 81 (1873), we think that the Fourteenth Amendment required the judge in this case to interrogate the jurors upon the subject of racial prejudice. South Carolina law permits challenges for cause, and authorizes the trial judge to conduct *voir dire* examination of potential jurors. The State having created this statutory framework for the selection of juries, the essential fairness required by the Due Process Clause of the Fourteenth Amendment requires that under the facts shown by this record the

---

[5] See *Mu'Min* v. *Virginia,* 500 U. S. 415, 425–426 (1991): "To be constitutionally compelled . . . it is not enough that such questions might be helpful. Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair."

petitioner be permitted to have the jurors interrogated on the issue of racial bias." *Id.*, at 526–527.

We have also come to recognize that the principles first propounded in *Witherspoon* v. *Illinois*, 391 U. S. 510 (1968), the reverse of which are at issue here, demand inquiry into whether the views of prospective jurors on the death penalty would disqualify them from sitting.[6] At its inception, *Witherspoon* conferred no "right" on a State, but was in reality a limitation of a State's making unlimited challenges for cause to exclude those jurors who "might hesitate" to return a verdict imposing death. *Id.*, at 512–513; see *Adams* v. *Texas*, 448 U. S., at 47–49. Upon consideration of the jury in *Witherspoon*, drawn as it was from a venire from which the State struck any juror expressing qualms about the death penalty,

---

[6] Illinois argues that, because of the changed structure in death penalty jurisprudence since *Furman* v. *Georgia*, 408 U. S. 238 (1972), *Witherspoon* principles should no longer guide this area. But analogous arguments have been previously raised and rejected. *Adams* v. *Texas*, 448 U. S. 38, 45–47 (1980). When considering the Texas death penalty scheme in light of *Witherspoon*, we stated: "[J]urors in Texas must determine whether the evidence presented by the State convinces them beyond reasonable doubt that each of the three questions put to them must be answered in the affirmative. In doing so, they must consider both aggravating and mitigating circumstances, whether appearing in the evidence presented at the trial on guilt or innocence or during the sentencing proceedings. Jurors will characteristically know that affirmative answers to the questions will result in the automatic imposition of the death penalty, and each of the jurors whose exclusion is challenged by petitioner was so informed. In essence, Texas juries must be allowed to consider 'on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed.' *Jurek* v. *Texas*, 428 U. S. 262, 271 (1976) (opinion of Stewart, Powell, and STEVENS, JJ.). This process is not an exact science, and the jurors under the Texas bifurcated procedure unavoidably exercise a range of judgment and discretion while remaining true to their instructions and their oaths." *Adams, supra*, at 46 (citation omitted). The balancing approach chosen by Illinois vests considerably more discretion in the jurors considering the death penalty, and, with stronger reason, *Witherspoon*'s general principles apply. Cf. *Turner* v. *Murray*, 476 U. S. 28, 34–35 (1986) (plurality opinion).

we found it "self-evident that, in its role as arbiter of the punishment to be imposed, this jury fell woefully short of that impartiality to which the petitioner was entitled under the Sixth and Fourteenth Amendments." 391 U. S., at 518. To preserve this impartiality, *Witherspoon* constrained the State's exercise of challenges for cause:

> "[A] State may not entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death. Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected." *Id.*, at 520–523 (footnotes omitted).

See also *Lockhart* v. *McCree*, 476 U. S. 162, 179–180 (1986). *Witherspoon* limited a State's power broadly to exclude jurors hesitant in their ability to sentence a defendant to death, but nothing in that decision questioned "the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear . . . that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them . . . ." 391 U. S., at 522, n. 21 (emphasis in original); see also *id.*, at 513–514.

In *Wainwright* v. *Witt*, 469 U. S. 412 (1985), we revisited footnote 21 of *Witherspoon*, and held affirmatively that "the State may exclude from capital sentencing juries that 'class' of veniremen whose views would prevent or substantially impair the performance of their duties in accord-

ance with their instructions or their oaths." 469 U. S., at 424, n. 5; see also *Lockett* v. *Ohio,* 438 U. S. 586, 595–596 (1978). Indeed, in *Lockhart* v. *McCree* we thereafter spoke in terms of "'*Witherspoon*-excludables'" whose removal for cause "serves the State's entirely proper interest in obtaining a single jury that could impartially decide all of the issues in [a capital] case." 476 U. S., at 180. From *Witt,* moreover, it was but a very short step to observe as well in *Lockhart:*

> "[T]he State may challenge for cause prospective jurors whose opposition to the death penalty is so strong that it would prevent them from impartially determining a capital defendant's guilt or innocence. *Ipso facto,* the State must be given the opportunity to identify such prospective jurors by questioning them at *voir dire* about their views of the death penalty." 476 U. S., at 170, n. 7.

This passage in *Lockhart* expanded but briefly upon what we had already recognized in *Witt:* "As with any other trial situation where an adversary wishes to exclude a juror because of bias, then, it is the adversary seeking exclusion who must demonstrate, *through questioning,* that the potential juror lacks impartiality. It is then the trial judge's duty to determine whether the challenge is proper." 469 U. S., at 423 (citation omitted; emphasis added).

We deal here with petitioner's ability to exercise intelligently his complementary challenge for cause against those biased persons on the venire who as jurors would unwaveringly impose death after a finding of guilt. Were *voir dire* not available to lay bare the foundation of petitioner's challenge for cause against those prospective jurors who would *always* impose death following conviction, his right not to be tried by such jurors would be rendered as nugatory and

meaningless as the State's right, in the absence of questioning, to strike those who would *never* do so.[7]

## D

The only issue remaining is whether the questions propounded by the trial court were sufficient to satisfy petitioner's right to make inquiry. As noted above, Illinois suggests that general fairness and "follow the law" questions, of the like employed by the trial court here, are enough to detect those in the venire who automatically would vote for the death penalty.[8] The State's own request for questioning under *Witherspoon* and *Witt* of course belies this argument. *Witherspoon* and its succeeding cases would be in large measure superfluous were this Court convinced that such general inquiries could detect those jurors with views pre-

---

[7] As the Fifth Circuit has observed *obiter dictum:* "All veniremen are potentially biased. The process of voir dire is designed to cull from the venire persons who demonstrate that they cannot be fair to *either* side of the case. Clearly, the extremes must be eliminated—*i. e.*, those who, in spite of the evidence, would automatically vote to convict or impose the death penalty or automatically vote to acquit or impose a life sentence." *Smith* v. *Balkcom*, 660 F. 2d 573, 578 (1981) (emphasis in original), modified, 671 F. 2d 858, cert. denied, 459 U. S. 882 (1982).

[8] Almost in passing the State also suggests that the "reverse-*Witherspoon*" inquiry is inapposite because of a putative "quantitative difference." Illinois requires a unanimous verdict in favor of imposing death, see *supra*, at 721–722; thus any one juror can nullify the imposition of the death penalty. "Persons automatically for the death penalty would not carry the same weight," Illinois argues, "because persons automatically for the death penalty would still need to persuade the remaining eleven jurors to vote *for* the death penalty." Brief for Respondent 27. The dissent chooses to champion this argument, *post*, at 750, although it is clearly foreclosed by *Ross* v. *Oklahoma*, 487 U. S. 81, 85 (1988), where we held that even one such juror on the panel would be one too many. See *supra*, at 728–729. In any event, the measure of a jury is taken by reference to the impartiality of each, individual juror. Illinois has chosen to provide a capital defendant 12 jurors to decide his fate, and each of these jurors must stand equally impartial in his or her ability to follow the law.

venting or substantially impairing their duties in accordance with their instructions and oath. But such jurors—whether they be unalterably in favor of, or opposed to, the death penalty in every case—by definition are ones who cannot perform their duties in accordance with law, their protestations to the contrary notwithstanding.

As to general questions of fairness and impartiality, such jurors could in all truth and candor respond affirmatively, personally confident that such dogmatic views are fair and impartial, while leaving the specific concern unprobed. More importantly, however, the belief that death should be imposed *ipso facto* upon conviction of a capital offense reflects directly on that individual's inability to follow the law. See *supra*, at 729. Any juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of law. See *Turner* v. *Murray*, 476 U. S., at 34–35 (plurality opinion). It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so.[9] A defendant on trial for his life must be permitted on *voir dire*

---

[9] That certain prospective jurors maintain such inconsistent beliefs— that they can follow the law, but that they will always vote to impose death for conviction of a capital offense—has been demonstrated, even in this case. See n. 2, *supra*. Indeed, in *Wainwright* v. *Witt*, 469 U. S. 412 (1985), we set forth the following exchange, highlighting this inconsistency in beliefs in regards to *Witherspoon* v. *Illinois*, 391 U. S. 510 (1968):

"THE COURT: Wait a minute, ma'am. I haven't made up my mind yet. Just have a seat. Let me ask you these things. Do you have any prefixed ideas about this case at all?

"[A]: Not at all.

"THE COURT: Will you follow the law that I give you?

"[A]: I could do that.

"THE COURT: What I am concerned about is that you indicated that you have a state of mind that might make you be unable to follow the law of this State.

"[A]: I could not bring back a death penalty.

"THE COURT: Step down." 469 U. S., at 432, n. 12.

to ascertain whether his prospective jurors function under such misconception. The risk that such jurors may have been empaneled in this case and "infected petitioner's capital sentencing [is] unacceptable in light of the ease with which that risk could have been minimized." *Id.*, at 36 (footnote omitted). Petitioner was entitled, upon his request, to inquiry discerning those jurors who, even prior to the State's case in chief, had predetermined the terminating issue of his trial, that being whether to impose the death penalty.

## III

JUSTICE SCALIA, in dissent, insists that Illinois is entitled to try a death penalty case with 1 or even 12 jurors who upon inquiry announce that they would automatically vote to impose the death penalty if the defendant is found guilty of a capital offense, no matter what the so-called mitigating factors, whether statutory or nonstatutory, might be. *Post,* at 742–746. But such jurors obviously deem mitigating evidence to be irrelevant to their decision to impose the death penalty: They not only refuse to give such evidence any weight but are also plainly saying that mitigating evidence is not worth their consideration and that they will not consider it. While JUSTICE SCALIA's jaundiced view of our decision today may best be explained by his rejection of the line of cases tracing from *Woodson* v. *North Carolina,* 428 U. S. 280 (1976), and *Lockett* v. *Ohio,* 438 U. S. 586 (1978), and developing the nature and role of mitigating evidence in the trial of capital offenses, see *Walton* v. *Arizona,* 497 U. S. 639, 669–673 (1990) (SCALIA, J., concurring in part and concurring in judgment); *Payne* v. *Tennessee,* 501 U. S. 808, 833 (1991) (SCALIA, J., concurring); *Sochor* v. *Florida, ante,* at 554 (SCALIA, J., concurring in part and dissenting in part), it is a view long rejected by this Court. More important to our purposes here, however, his view finds no support in either the statutory or decisional law of Illinois because that law is consistent with the requirements concerning mitigating evi-

dence described in this Court's cases. See *Turner* v. *Murray, supra,* at 34–35 (plurality opinion).

The Illinois death penalty statute provides that "[t]he court shall consider, or shall instruct the jury to consider any aggravating and any mitigating factors which are relevant to the imposition of the death penalty," Ill. Rev. Stat., ch. 38, ¶ 9–1(c) (Supp. 1990), and lists certain mitigating factors that the legislature must have deemed relevant to such imposition, *ibid.*[10] The statute explicitly directs the procedure controlling this jury deliberation:

> "If there is a unanimous finding by the jury that one or more of the factors [enumerated in aggravation] exist, the jury shall consider aggravating and mitigating factors as instructed by the court and shall determine whether the sentence of death shall be imposed. If the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death." ¶ 9–1(g).

In accord with this statutory procedure, the trial judge in this case instructed the jury:

> "In deciding whether the Defendant should be sentenced to death, you should consider all the aggravating

---

[10] Illinois Rev. Stat., ch. 38, ¶ 9–1(c) (Supp. 1990), provides:

"Mitigating factors may include but need not be limited to the following:

"(1) the defendant has no significant history of prior criminal activity;

"(2) the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, although not such as to constitute a defense to prosecution;

"(3) the murdered individual was a participant in the defendant's homicidal conduct or consented to the homicidal act;

"(4) the defendant acted under the compulsion of threat or menace of the imminent infliction of death or great bodily harm;

"(5) the defendant was not personally present during commission of the act or acts causing death."

factors supported by the evidence and all the mitigating factors supported by the evidence.

. . . . .

"If you unanimously find, from your consideration of all the evidence, that there are no mitigating factors sufficient to preclude imposition of the death sentence, then you should sign the verdict requiring the Court sentence the Defendant to death." App. 122–123.

Any juror who states that he or she will automatically vote for the death penalty without regard to the mitigating evidence is announcing an intention not to follow the instructions to consider the mitigating evidence and to decide if it is *sufficient* to preclude imposition of the death penalty. Any contrary reading of this instruction, or more importantly, the controlling statute, renders the term "sufficient" meaningless. The statute plainly indicates that a lesser sentence is available in every case where mitigating evidence exists; thus any juror who would invariably impose the death penalty upon conviction cannot be said to have reached this decision based on all the evidence. While JUSTICE SCALIA chooses to argue that such a "merciless juro[r]" is not a "lawless" one, *post*, at 751, he is in error, for such a juror will not give mitigating evidence the consideration that the statute contemplates. Indeed, the Illinois Supreme Court recognizes that jurors are not impartial if they would automatically vote for the death penalty, and that questioning in the manner petitioner requests is a direct and helpful means of protecting a defendant's right to an impartial jury. See n. 3, *supra*. The State has not suggested otherwise in this Court.

Surely if in a particular Illinois case the judge, who imposes sentence should the defendant waive his right to jury sentencing under the statute, see n. 1, *supra*, was to announce that, to him or her, mitigating evidence is beside the point and that he or she intends to impose the death penalty without regard to the nature or extent of mitigating evidence

if the defendant is found guilty of a capital offense, that judge is refusing in advance to follow the statutory direction to consider that evidence and should disqualify himself or herself. Any juror to whom mitigating factors are likewise irrelevant should be disqualified for cause, for that juror has formed an opinion concerning the merits of the case without basis in the evidence developed at trial. Accordingly, the defendant in this case was entitled to have the inquiry made that he proposed to the trial judge.

## IV

Because the "inadequacy of *voir dire*" leads us to doubt that petitioner was sentenced to death by a jury empaneled in compliance with the Fourteenth Amendment, his sentence cannot stand.[11] *Turner* v. *Murray*, 476 U. S., at 37. Accordingly, the judgment of the Illinois Supreme Court affirming petitioner's death sentence is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*So ordered.*

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE THOMAS join, dissenting.

The Court today holds that a juror who will always impose the death penalty for capital murder is not "impartial" in the sense required by the Sixth Amendment; that the Constitution requires that *voir dire* directed to this specific "bias" be provided upon the defendant's request; and that the more general questions about "fairness" and ability to "follow the law" that were asked during *voir dire* in this case were inadequate. Because these conclusions seem to me jointly and severally wrong, I dissent.

---

[11] Our decision today has no bearing on the validity of petitioner's conviction. *Witherspoon*, 391 U. S., at 523, n. 21.

## I

The Court today reaffirms our oft-repeated holding that the Sixth Amendment (which is binding on the States through the Fourteenth Amendment) does not require a jury trial at the sentencing phase of a capital case. *Ante,* at 726. See *Clemons* v. *Mississippi,* 494 U. S. 738, 745–746 (1990); *Walton* v. *Arizona,* 497 U. S. 639, 647–649 (1990); *Cabana* v. *Bullock,* 474 U. S. 376, 385 (1986); *Spaziano* v. *Florida,* 468 U. S. 447, 464 (1984); see also *McMillan* v. *Pennsylvania,* 477 U. S. 79, 93 (1986) (no right to jury sentencing in noncapital case). In a separate line of cases, however, we have said that the exclusion of persons who merely "express serious reservations about capital punishment" from sentencing juries violates the right to an *"impartial* jury" under the *Sixth Amendment. Witherspoon* v. *Illinois,* 391 U. S. 510, 518 (1968); see also *Adams* v. *Texas,* 448 U. S. 38, 40 (1980); *Wainwright* v. *Witt,* 469 U. S. 412, 423 (1985). The two propositions are, of course, contradictory: If capital sentencing is not subject to the Sixth Amendment jury guarantee, then neither is it subject to the subsidiary requirement that the requisite jury be impartial.

The Court effectively concedes that the Sixth Amendment does not apply here, relying instead upon the Due Process Clause of the Fourteenth Amendment, which it says requires that any sentencing jury be "impartial" *to the same extent* that the Sixth Amendment requires a jury at the guilt phase to be impartial. *Ante,* at 727. I agree with that. See *Gardner* v. *Florida,* 430 U. S. 349, 358 (1977) (plurality opinion) (sentencing procedures must comply with the requirements of the Due Process Clause). I do not agree, however, that unconstitutional "partiality," for either Sixth Amendment or Fourteenth Amendment purposes, is established by the fact that a juror's standard of judgment—which he applies to the defendant on trial as he would to all others— happens to be the standard least favorable to the defense. Assume, for example, a criminal prosecution in which the

State plans to prove only elements of circumstantial evidence *x*, *y*, and *z*. Surely counsel for the defendant cannot establish unconstitutional partiality (and hence obtain mandatory recusal) of a juror by getting him to state, on *voir dire*, that if, in a prosecution for this crime, elements *x*, *y*, and *z* were shown, he would always vote to convict. Such an admission would simply demonstrate that particular juror's standard of judgment regarding how evidence deserves to be weighed— and even though application of that standard will, of a certainty, cause the juror to vote to convict in the case at hand, the juror is not therefore "biased" or "partial" in the constitutionally forbidden sense. So also, it seems to me, with jurors' standards of judgment concerning appropriateness of the death penalty. The fact that a particular juror thinks the death penalty proper *whenever* capital murder is established does not disqualify him. To be sure, the law governing sentencing verdicts says that a jury *may* give less than the death penalty in such circumstances, just as, in the hypothetical case I have propounded, the law governing guilt verdicts says that a jury *may* acquit despite proof of elements *x*, *y*, and *z*. But in neither case does the requirement that a more defense-favorable option be left available to the jury convert into a requirement that all jurors must, on the facts of the case, be amenable to entertaining that option.

A State in which the jury does the sentencing no more violates the due process requirement of impartiality by allowing the seating of jurors who favor the death penalty than does a State with judge-imposed sentencing by permitting the people to elect (or the executive to appoint) judges who favor the death penalty. Cf. *United States* v. *Grinnell Corp.*, 384 U. S. 563, 583 (1966); *United States* v. *Richards*, 737 F. 2d 1307, 1311 (CA4 1984), cert. denied, 469 U. S. 1106 (1985); *United States* v. *Thompson*, 483 F. 2d 527, 530–531 (CA3 1973) (Adams, J., dissenting); 2 W. LaFave & J. Israel, Criminal Procedure § 21.4(b), p. 747 (1984) (adherence to a particular legal principle is not a basis for challenging impar-

tiality of a judge).   Indeed, it is precisely because such individual juror "biases" *are* constitutionally permissible that *Witherspoon* v. *Illinois* imposed the limitation that a State may not skew the makeup of the jury *as a whole* by excluding all death-scrupled jurors.   391 U. S., at 519–523.

## II

In the Court's view, a juror who will always impose the death penalty upon proof of the required aggravating factors[1] "will fail in good faith to consider the evidence of aggravating and mitigating circumstances *as the instructions require him to do.*"   *Ante,* at 729 (emphasis added); see also *ante,* at 738–739.   I would agree with that if it were true that the instructions required jurors to deem certain evidence to be "mitigating" and to weigh that evidence in deciding the penalty.   On that hypothesis, the juror's firm attachment to the death penalty would demonstrate an absence of the constitutionally requisite impartiality, which requires that the decisionmaker be able "conscientiously [to] apply the law and find the facts."   *Witt, supra,* at 423; see also *Lockhart* v. *McCree,* 476 U. S. 162, 178 (1986); *Adams, supra,* at 45.   The hypothesis, however, is not true as applied to the facts of the present case.   Remarkably, the Court rests its

---

[1] It is important to bear in mind that the juror who will ignore the requirement of finding an aggravating factor is not at issue here.   Petitioner does not contend that the *voir dire* question he seeks is necessary because the death-inclined juror will not impartially make the strictly factual determination, at the first stage of Illinois' two-part sentencing procedure, that the defendant is *eligible* for the death penalty because one of the statutorily required aggravating factors exists (in this case, the fact that the murder was a contract killing).   Obviously, the standard question whether the juror can obey the court's instructions is enough to disclose that difficulty.   Petitioner's theory—which the Court accepts, *ante,* at 735–736—is that the special *voir dire* question is necessary to identify those veniremen who, at the second, weighing stage, after having properly found the aggravating factor, "will never find enough mitigation to preclude imposing death."   Brief for Petitioner 8.

judgment upon a juror's inability to comply with instructions, *without bothering to describe the key instructions.* When one considers them, it is perfectly clear that they do not preclude a juror from taking the view that, for capital murder, a death sentence is always warranted.

The jury in this case was instructed that "[a]ggravating factors are reasons why the Defendant should be sentenced to death"; that "[m]itigating factors are reasons why the Defendant should not be sentenced to death"; that the jury must "consider all the aggravating factors supported by the evidence and all the mitigating factors supported by the evidence"; and that the jury should impose a death sentence if it found, "from [its] consideration of all the evidence, that there are no mitigating factors sufficient to preclude imposition of a death sentence," App. 122–123.[2] The instructions did not in any way further define what constitutes a "mitigating" or an "aggravating" factor, other than to point out that the jury's finding, at the death-eligibility stage, that petitioner committed a contract killing was necessarily an aggravator. As reflected in these instructions, Illinois law permitted each juror to define for himself whether a particular item of evidence was mitigating, in the sense that it provided a "reaso[n] why the Defendant should not be sentenced to death." Thus, it is simply not the case that Illinois law precluded a juror from taking the bright-line position that there are no valid reasons why a defendant who has committed a contract killing should not be sentenced to death. Such a juror does not "fail . . . to consider the evidence," *ante,* at

---

[2] The Court attaches great weight to the use of the term "sufficient" in these instructions and in the governing statute. The Court views this term as implicitly establishing that the jurors *must* find some mitigation. (How else, the Court reasons, could the jury determine whether there is "sufficient" mitigation?) *Ante,* at 738. The inference is plainly fallacious: A direction to a person to consider whether there are "sufficient" reasons to do something does not logically imply that in *some* circumstance he *must* find something to be a "reason," and must find that reason to be "sufficient."

729; cf. Ill. Rev. Stat., ch. 38, ¶ 9–1(c) (Supp. 1990) ("The court . . . shall instruct the jury to consider any aggravating and any mitigating factors which are relevant . . ."); he simply fails to give it the effect the defendant desires.[3]

Nor can the Court's exclusion of these death-inclined jurors be justified on the theory that—regardless of what Illinois law purports to permit—the *Eighth Amendment* prohibits a juror from always advocating a death sentence at the weighing stage. Our cases in this area hold, not that the sentencer *must give effect to* (or even that he *must consider*) the evidence offered by the defendant as mitigating, but rather that he must "not be *precluded* from considering" it, *Lockett* v. *Ohio*, 438 U. S. 586, 604 (1978) (plurality opinion) (emphasis added); *Bell* v. *Ohio*, 438 U. S. 637, 642 (1978) (plurality opinion) (same). See also *Walton*, 497 U. S., at 652 (plurality opinion) ("'[T]he requirement of individualized sentencing in capital cases is satisfied by *allowing* the jury to

---

[3] The Court notes that the Illinois statute lists certain potentially mitigating factors, see Ill. Rev. Stat., ch. 38, ¶ 9–1(c) (Supp. 1990), and therefore concludes that the legislature "must have deemed [them] relevant" to the imposition of the death penalty. *Ante*, at 737. It is of course true that the listed factors are "relevant" in the sense that a juror "may" find them to be mitigating, ¶ 9–1(c), and also in the sense that the defendant must be allowed to introduce evidence concerning these factors. But the statute's permissive and nonexhaustive list clearly does not establish what the Court needs to show, viz., that jurors *must* deem these (or some other factors) to be actually "mitigating." The fact that the jury has the discretion to deem evidence to be mitigating cannot establish that there is an obligation to do so. Indeed, it is impossible in principle to distinguish between a juror who does not believe that *any* factor can be mitigating from one who believes that a *particular* factor—*e. g.*, "extreme mental or emotional disturbance," ¶ 9–1(c)(2)—is not mitigating. (Presumably, under today's decision a juror who thinks a "bad childhood" is never mitigating must also be excluded.) In any event, in deciding whether to vacate petitioner's sentence on account of juror impartiality—*i. e.*, on the basis that one or more of petitioner's jurors may have refused to follow the instructions—we must be guided, not by the instructions that (perhaps) *should* have been given (a question of state law which we have no authority to review), but by the instructions that *were* given.

consider all relevant mitigating evidence'") (emphasis added) (quoting *Blystone* v. *Pennsylvania*, 494 U. S. 299, 307 (1990)); *Saffle* v. *Parks*, 494 U. S. 484, 490 (1990) ("[T]he State cannot *bar* relevant mitigating evidence") (emphasis added); *McKoy* v. *North Carolina*, 494 U. S. 433, 442–443 (1990) ("[E]ach juror [must] be *permitted* to consider and give effect to mitigating evidence") (emphasis added); *Penry* v. *Lynaugh*, 492 U. S. 302, 318 (1989) (a State may not "*prevent* the sentencer from considering and giving effect to [mitigating] evidence") (emphasis added); *id.*, at 328 (jury must be "*provided with a vehicle* for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision") (emphasis added); *Mills* v. *Maryland*, 486 U. S. 367, 375 (1988) (State may not impose any "*barrier* to the sentencer's consideration of all mitigating evidence") (emphasis added); *Turner* v. *Murray*, 476 U. S. 28, 34 (1986) (plurality opinion) (sentencer "*must be free* to weigh relevant mitigating evidence") (emphasis added); *Roberts* v. *Louisiana*, 431 U. S. 633, 637 (1977) (mandatory death penalty statute is unconstitutional because it "does not *allow* for consideration of particularized mitigating factors") (emphasis added); *Woodson* v. *North Carolina*, 428 U. S. 280, 303 (1976) (plurality opinion) (same); *Jurek* v. *Texas*, 428 U. S. 262, 271 (1976) (opinion of Stewart, Powell, and STEVENS, JJ.) ("A jury must be *allowed* to consider . . . all relevant [mitigating] evidence") (emphasis added).   Similarly, where the judge is the final sentencer we have held, not that he *must* consider mitigating evidence, but only that he may not, on *legal* grounds, refuse to consider it, *Hitchcock* v. *Dugger*, 481 U. S. 393, 394, 398–399 (1987); *Eddings* v. *Oklahoma*, 455 U. S. 104, 113–114 (1982) (a sentencing judge may not "refuse to consider, *as a matter of law*, any relevant mitigating evidence") (emphasis in original).   *Woodson* and *Lockett* meant to ensure that the sentencing jury would function as a "link between contemporary community values and the penal system," *Witherspoon*, 391 U. S., at 519, n. 15; they did *not* mean to specify what the *content* of those values

must be.[4]  The "conscience of the community," *id.*, at 519, also includes those jurors who are not swayed by mitigating evidence.

The Court relies upon dicta contained in our opinion in *Ross* v. *Oklahoma*, 487 U. S. 81 (1988).  *Ante,* at 728–729. In that case, the defendant challenged for cause a juror who stated during *voir dire* that he would automatically vote to impose a death sentence if the defendant were convicted. The trial court rejected the challenge, and Ross used a peremptory challenge to remove the juror.  Although we noted that the state appellate court had assumed that such a juror would not be able to follow the law, 487 U. S., at 84–85 (citing *Ross* v. *State*, 717 P. 2d 117, 120 (Okla. Crim. App. 1986)), we held that Ross was not deprived of an impartial jury because none of the jurors who actually sat on the petit jury was partial.  487 U. S., at 86–88.  In reaching that conclusion, however, we expressed the view that had the challenged juror actually served, "the sentence would have to be overturned."  *Id.*, at 85.  The Court attaches great weight to this dictum, which it describes as "announc[ing] our considered view," *ante,* at 728.  This is hyperbole.  It is clear on the face of the opinion that the dictum was based entirely on the fact that the state court had assumed that such a juror was unwilling to follow the law at the penalty phase—a point we did not purport to examine independently.  487 U. S., at 84–85.  The *Ross* dictum thus merely reflects the quite modest proposition that a juror who will not follow the law is not impartial.

Because Illinois would not violate due process by seating a juror who will not be swayed by mitigating evidence at the weighing stage, the Constitution does not entitle petitioner to identify such jurors during *voir dire.*

---

[4] The Court's only response to this point is the suggestion that it somehow rests upon my rejecting the *Woodson-Lockett* line of cases.  *Ante,* at 736.  That is not so, as my quotations from over a dozen *Woodson-Lockett* cases make painfully clear.

## III

Even if I agreed with the Court, however, that jurors who will always advocate a death sentence for capital murder are not "impartial" and must be excused for cause, I would not agree with the further conclusion that the Constitution requires a trial court to make specific inquiries on this subject during *voir dire*.

In *Mu'Min* v. *Virginia*, 500 U. S. 415 (1991), we surveyed our cases concerning the requirements of *voir dire* and concluded that, except where interracial capital crimes are at issue, trial courts "retai[n] great latitude in deciding what questions should be asked on *voir dire*," *id.*, at 424; see also *Ristaino* v. *Ross*, 424 U. S. 589, 594 (1976). We emphasized that our authority to require specific inquiries on *voir dire* is particularly narrow with respect to state-court trials, where we may not exercise supervisory authority and are "limited to enforcing the commands of the United States Constitution," *Mu'Min*, 500 U. S., at 422. We concluded, as a general matter, that a defendant was entitled to specific questions only if the failure to ask them would render his trial "fundamentally unfair," *id.*, at 426. Thus, we have held that absent some "special circumstance," *Turner, supra,* at 37, a "generalized but thorough inquiry into the impartiality of the veniremen" is a constitutionally adequate *voir dire. Ristaino, supra,* at 598. Finally, we have long acknowledged that, in light of the credibility determinations involved, a trial court's finding that a particular juror is impartial may "be overturned only for 'manifest error,'" *Patton* v. *Yount*, 467 U. S. 1025, 1031 (1984) (quoting *Irvin* v. *Dowd*, 366 U. S. 717, 723 (1961)); see also *Mu'Min, supra,* at 428.

Were the Court today extending *Witherspoon*'s jury-balancing rule so as to require affirmatively that a capital sentencing jury contain a mix of views on the death penalty, that requirement would of course constitute a "special circumstance" necessitating specific inquiry into the subject on *voir dire*. But that is not what petitioner has sought, and it

is not what the Court purports to decree. Its theory, as I
have described, is that a juror who will always impose the
death penalty for capital murder is one who "will fail in good
faith to consider the evidence of aggravating and mitigating
circumstances *as the instructions require him to do*," *ante,*
at 729 (emphasis added). Even assuming (contrary to the
reality) that that theory fits the facts of this case (*i. e.,* that
the instructions required jurors to be open to voting against
the death penalty on the basis of allegedly mitigating circum-
stances), I see no reason why jurors who will defy this ele-
ment of the instructions, like jurors who will defy other ele-
ments of the instructions, see, *e. g.,* n. 1, *supra,* cannot be
identified by more general questions concerning fairness and
willingness to follow the law. In the present case, the trial
court on *voir dire* specifically asked nine of the jurors who
ultimately served whether they would follow the court's in-
structions even if they disagreed with them, and all nine an-
swered affirmatively. Moreover, all the veniremen were in-
formed of the nature of the case and were instructed that, if
selected, they would be required to follow the court's instruc-
tions; subsequently, all 12 jurors responded negatively to a
specific question whether there was any reason why they did
not think they could be fair and impartial in this case.
These questions, which were part of an extensive *voir dire,*
succeeded in identifying one juror who would be unable to
follow the court's instructions at the penalty phase: The juror
admitted that, because of the anger he felt over the murder
of his friend's parents, his sentiments in favor of the death
penalty were so strong that he did not believe he could be
fair to petitioner at the sentencing hearing. Taking appro-
priate account of the opportunity for the trial court to ob-
serve and evaluate the demeanor of the veniremen, I see no
basis for concluding that its finding that the 12 jurors were
impartial was manifestly erroneous.

The Court provides two reasons why a specific question
must be asked, but neither passes the most gullible scrutiny.

First, the Court states that general questions would be insufficient because "such jurors could in all truth and candor respond affirmatively, personally confident that such dogmatic views are fair and impartial . . . ." *Ante,* at 735. In other words, jurors who would always impose the death penalty would be violating the instructions without realizing that that is what they are doing. It seems to me quite obvious that solution of this problem does not require a specific question of each juror, but can be achieved by simply changing the instructions so that these well-intentioned jurors will understand that an aggravators-always-outweigh-mitigators view is prohibited. The record does not reflect that petitioner made any objection to the clarity of the instructions in this regard.

Second, the Court asserts that the adequacy of general *voir dire* questions is belied by "[t]he State's own request for questioning under *Witherspoon* and *Witt.*" *Ante,* at 734. Without such questioning, we are told, *"Witherspoon* and its succeeding cases would be in large measure superfluous." *Ibid.* But *Witherspoon* did *not,* as this reasoning assumes, give the State a right to exclude jurors ("[I]t is clear beyond peradventure that *Witherspoon* is not a ground for challenging any prospective juror," *Adams,* 448 U. S., at 47–48), and it is therefore quite impossible that anything we say on that subject today could render the holding of *Witherspoon* "superfluous." What the Court describes, *ante,* at 733, as a "very short step" from *Witherspoon, Adams,* and *Witt,* is in fact a great leap over an unbridgeable chasm of logic. *Witherspoon* and succeeding cases held that the State was not constitutionally *prevented* from excluding jurors who would on no facts impose death; from which the Court today concludes that a State is constitutionally *compelled* to exclude jurors who would, on the facts establishing the particular aggravated murder, invariably impose death. The Court's argument that because the Constitution requires one it must re-

quire the other obviously rests on a false premise.[5] In any event, the mere fact that Illinois sees fit to request one or another question on *voir dire* in order to discover one-result-only jurors cannot, as a logical matter, establish that more general questioning is *constitutionally inadequate* to do the job.

For similar reasons, I reject petitioner's argument that it is "fundamentally unfair" to allow Illinois to make specific inquiries concerning those jurors who will always vote against the death penalty but to preclude the defendant from discovering (and excluding) those jurors who will always vote in favor of death. Brief for Petitioner 14 (citing *Wardius* v. *Oregon*, 412 U. S. 470 (1973)). Even if it were unfair, of course, the State should be given the option, which today's opinion does not provide, of abandoning the *Witherspoon* qualification. (Where the death penalty statute does not contain a unanimity requirement, I am confident prosecutors would prefer that to the wholesale elimination of jurors favoring the death penalty that will be the consequence of today's decision.) But in fact there is no unfairness in the asymmetry. By reason of Illinois' death penalty unanimity requirement, Ill. Rev. Stat., ch. 38, ¶ 9–1(g) (Supp. 1990), the practical consequences of allowing the two types of jurors to serve are vastly different: A single death penalty opponent can block that punishment, but 11 unwavering advocates cannot impose it. And more fundamentally, the asymmetry is not unfair because, under Illinois law as reflected in the

---

[5] If, as the Court claims, this case truly involved "the reverse" of the principles established in *Witherspoon* v. *Illinois*, 391 U. S. 510 (1968), and the cases following it, *ante*, at 731, then it is difficult to understand why petitioner would not be entitled to challenge, not just those jurors who will "automatically" impose the death penalty, but also those whose sentiments on the subject are sufficiently strong that their faithful service as jurors will be *"substantially impaired"*—the reformulated standard we adopted in *Adams* v. *Texas*, 448 U. S. 38 (1980), and *Wainwright* v. *Witt*, 469 U. S. 412 (1985). The Court's failure to carry its premise to its logical conclusion suggests its awareness that the premise is wrong.

statute and instructions in this case, the *Witherspoon*-disqualified juror is a lawless juror, whereas the juror to be disqualified under the Court's new rule is not. In the first stage of Illinois' two-part sentencing hearing, jurors *must* determine, on the facts, specified aggravating factors, and at the second, weighing stage, they *must* impose the death penalty for murder with particular aggravators if they find "no mitigating factors sufficient to preclude [its] imposition." But whereas the finding of aggravation is mandatory, the finding of mitigation is optional; what constitutes mitigation is not defined and is left up to the judgment of each juror. Given that there will *always* be aggravators to be considered at the weighing stage, the juror who says he will never vote for the death penalty, no matter what the facts, is saying that he will not apply the law (the classic case of partiality)—since the facts may show no mitigation. But the juror who says that he will always vote for the death penalty is *not* promising to be lawless, since there is no case in which he is by law *compelled* to find a mitigating fact "sufficiently mitigating." The people of Illinois have decided, in other words, that murder with certain aggravators will be punished by death, unless the jury chooses to extend mercy. That scheme complies with our (ever-expanding) death penalty jurisprudence as it existed yesterday. The Court has, in effect, now added the *new* rule that no merciless jurors can sit.

\*    \*    \*

Sixteen years ago, this Court decreed—by a sheer act of will, with no pretense of foundation in constitutional text or American tradition—that the People (as in We, the People) cannot decree the death penalty, absolutely and categorically, for *any* criminal act, even (presumably) genocide; the jury must always be given the option of extending mercy. *Woodson*, 428 U. S., at 303–305. Today, obscured within the fog of confusion that is our annually improvised Eighth Amendment, "death is different" jurisprudence, the Court strikes a

further blow against the People in its campaign against the death penalty. Not only must mercy be allowed, but now only the merciful may be permitted to sit in judgment. Those who agree with the author of Exodus, or with Immanuel Kant,[6] must be banished from American juries—not because the People have so decreed, but because such jurors do not share the strong penological preferences of this Court. In my view, that not only is not required by the Constitution of the United States; it grossly offends it.

---

[6] See Exodus 21:12 ("He that smiteth a man, so that he die, shall be surely put to death"); I. Kant, The Philosophy of Law 198 [1796] (W. Hastie transl. 1887) ("[W]hoever has committed Murder, must *die*. . . . Even if a Civil Society resolved to dissolve itself with the consent of all its members[,] . . . the last Murderer lying in the prison ought to be executed before the resolution was carried out. This ought to be done in order that every one may realize the desert of his deeds . . .").