United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 30, 2006**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 04-70042

_____

PATRICK BRYAN KNIGHT,

Petitioner - Appellant,

versus

NATHANIEL QUARTERMAN, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Texas, Amarillo
USDC No. 2:99-CV-00085

_____

Before JOLLY, HIGGINBOTHAM, and BENAVIDES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:[1]

Patrick Bryan Knight ("Knight") was convicted of capital murder and sentenced to death for the 1991 murders of Walter and Mary Ann Werner. This court granted a certificate of appealability ("COA") authorizing Knight to appeal the district court's denial of habeas relief on his <u>Brady</u> and ineffective assistance of counsel claims. We AFFIRM.

---

[1]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Knight and a companion, Robert Bradfield, broke into the home of Knight's neighbors, Walter and Mary Ann Werner, on Monday morning, August 26, 1991, after the Werners had left for work. When the Werners came back home that evening, Knight and Bradfield locked them in the basement of their home. The Werners were held captive in their basement that night and the next day, during which Knight and Bradfield drove around in the Werners' vehicles. Around midnight on Tuesday, Knight bound, gagged, and blindfolded the couple, forced them into their own van, and drove them to a location in the country about four miles away from their home. He made them get out of the van and kneel, and then he shot each of them in the back of the head, execution-style. He dragged their bodies into a ditch on the side of the road and returned to his trailer house and went to sleep.

During their investigation into the Werners' disappearance, law enforcement officers questioned Knight, who lived in a trailer house next door to the Werners' home. Although Knight initially denied involvement, he eventually confessed and led the officers to the location of the victims' bodies. Knight was incarcerated in the Randall County Jail from the time of his arrest in 1991 until he was moved to death row in 1993. Deputy Sheriff Cindy Risley, one of Knight's jailers, developed a personal relationship with Knight, who began calling Risley "Mom".

At the punishment phase of the trial, the State presented the following evidence: Knight was on probation for the burglary of a grocery store at the time of the murders. He had stolen money from a convenience store cash register while the clerk was away from the register. On the day of the murders, Knight went to Ted Ramirez's home and threatened to kill him. He also went to Deborah Martin's home that day and told her he would "get" her and her boyfriend for accusing him of stealing. Knight told other inmates that he planned to avoid prison by pretending that he was insane when he killed the Werners, and he asked them for advice on what kind of statements and behavior could result in a diagnosis of insanity. He had problems getting along with other inmates in the jail and threatened to kill his cellmates with a shank made from a coat-hanger. He hid razor blades, scissors, sharpened paper clips, and rope in his cell, and kept contraband cleaning powder in a baby powder container in his cell. A jury list was found in his cell. He threatened to kill himself and others rather than be sent to prison. He staged a suicide attempt while in jail. Because of these incidents, he was kept isolated in a single cell for almost the entire two years he was in jail prior to trial.

Knight's counsel did not call any witnesses at the punishment phase. However, they elicited the following mitigating evidence through cross-examination of the State's witnesses: Although the State's witnesses were aware of verbal threats by Knight, none of them had observed Knight commit any violent acts against anyone

else; Knight did not threaten to injure his cellmates at the county jail with the shank, but instead intended to harm himself with it; Knight did not injure any of his cellmates; prior to his arrest, no one had observed Knight in possession of a weapon; Knight's prior crimes did not involve physical harm to anyone; Knight had cooperated with the police; Knight had a history of alcohol abuse; and the district clerk had given Knight a copy of the jury list pursuant to state law. In closing argument, defense counsel also noted Knight's young age (23) at the time of the murders.

Knight was convicted of capital murder and sentenced to death. His conviction and sentence were affirmed on direct appeal. Knight v. State, Cause No. 71,795 (Tex. Crim. App. March 6, 1996) (unpublished). Knight did not file a petition for a writ of certiorari.

The state habeas court denied Knight's request for an evidentiary hearing and denied his application for state habeas relief. The Texas Court of Criminal Appeals adopted the trial court's findings and conclusions and denied relief. Ex parte Knight, No. 40,236-01 (Tex. Crim. App. March 10, 1999) (unpublished).

Knight filed a preliminary federal habeas petition in March 1999, and an amended petition in May 1999. The magistrate judge held an evidentiary hearing and recommended that relief be denied.[2]

---

[2]The magistrate judge stated that the federal evidentiary hearing was conducted, in large part, because of Knight's

4

The district court overruled Knight's objections and adopted the magistrate judge's recommendation. The district court denied Knight's request for a COA.

Knight requested a COA from this court to appeal the denial of relief as to four claims. Based on our "threshold inquiry", consisting of "an overview of the claims in the habeas petition and a general assessment of their merits," Miller-El v. Cockrell, 537 U.S. 322, 327, 336 (2003), this court granted a COA for three of the four claims: (1) whether Knight's right to due process was violated by the prosecution's suppression of mitigating evidence on future dangerousness; (2) whether Knight's trial counsel rendered ineffective assistance at both phases of his trial by failing to adequately investigate and present evidence of Knight's mental condition and other mitigating circumstances; and (3) whether Knight's rights were violated when the trial judge granted the State's challenge for cause and excluded a prospective juror.

The parties were given an opportunity to file supplemental briefs with respect to the merits of the claims for which a COA was granted. Both parties declined, stating that they had nothing to add to the briefs on the COA application. Having considered the arguments of counsel and based on our review of the record of the

allegations that he was unable to present Deputy Risley's testimony and/or statements to the federal habeas court because of interference by law enforcement. The State does not argue that the federal evidentiary hearing was inappropriate or that the evidence presented at the hearing is unexhausted.

state court trial, and the state and federal habeas proceedings, we conclude that the state court's decision to deny relief on these claims is not based on an unreasonable determination of the facts in the light of the evidence presented, and is neither contrary to, or an unreasonable application of clearly established federal law. We therefore AFFIRM the district court's denial of federal habeas relief, for the reasons that follow.

II

Knight is not entitled to federal habeas relief on his claims unless the state court's adjudication of the claims

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The state court's factual determinations "shall be presumed to be correct", and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

III

A

Knight claims that the prosecution, which he argues included Deputy Risley as a member of its team, violated his right to due process by suppressing her mitigating evidence on future

6

dangerousness. This claim is reviewed under the clearly established law of Brady v. Maryland, 373 U.S. 83 (1963). "The Due Process Clause of the Fourteenth Amendment requires prosecutors to disclose to a defendant, on request, any evidence which is favorable and material to the issue of guilt or punishment." Titsworth v. Dretke, 401 F.3d 301, 306 (5th Cir. 2005). "This disclosure requirement imposes a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Id. (internal quotations omitted). To establish a Brady claim, the petitioner must demonstrate: "(1) the prosecutor suppressed evidence, (2) favorable to the defense, and (3) material to guilt or punishment." Pippin v. Dretke, 434 F.3d 782, 789 (5th Cir. 2005) (citing Brady, 373 U.S. at 87). "The suppressed evidence is material if there is 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Id. (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)). However, "[t]he State has no obligation to point the defense toward potentially exculpatory evidence when that evidence is either in the possession of the defendant or can be discovered by exercising due diligence." Id. (quoting Rector v. Johnson, 120 F.3d 551, 558-59 (5th Cir. 1997)).

B

Knight asserts that Deputy Cindy Risley was aware of, and could have testified, that he was emotionally disturbed and needed

7

treatment; that his family abandoned him at an early age and he had no support from anyone while awaiting trial; that he was a loner, housed in a seclusion cell, but she was not afraid of him; that he was not dangerous in all situations, but existed well within a structured environment; that she spoke with him about the murders and observed his remorse; that he did not intend to use the weapons found in his cell, but made and hid them because he was bored; that he showed her the weapons, allowing her to take credit for finding them; that he was obsessive about keeping his cell clean; that he tried to protect his jailers; that he told her that his co-defendant, Bradfield, had participated in the murders, but that he was going to take the blame for Bradfield because he did not think that Bradfield or his family could handle the death penalty; that Bradfield was violent and had stabbed one inmate in the jail and had broken another inmate's ribs; and that, in her opinion, Knight would not be violent in the future if he received a life sentence. Knight contends that, even though Risley did not express her opinions about Knight to anyone, her opinions were nevertheless suppressed by the State because Risley was employed as a law enforcement officer by the county that prosecuted him and was, therefore, a member of the prosecution team. He contends that the suppressed evidence is material because it provided alternative and reasonable explanations for the same evidence that the prosecution relied on to obtain a death sentence.

It should be noted that Risley was in fact called as a witness for the State at the punishment phase of Knight's trial. She testified that she had been a Deputy Jailer for the Randall County Sheriff's Department for sixteen months, and had seen Knight regularly during that entire time. According to Risley, the inmates viewed her as a mother figure and a lot of them called her "Mother". She testified that Knight has a violent temper, but that she was not really scared of him when he was mad because there was a thick metal wall between them. However, if the wall was not there, she testified that she would be afraid of him if he was mad. She testified that Knight had never threatened her. She testified further that she had found various contraband items in his cell, including a screwdriver that he was making into a shank during the week of jury selection, razor blades, sharpened paper clips, medication, a rope, and a baby powder container containing Comet cleanser. She also found in his cell a jury list with Knight's handwritten notations, and a drawing of a cartoon character with the name "Mary Werner" written beside it. On cross-examination, Risley testified that she was aware that the law required the district clerk to give capital murder defendants a list of prospective jurors, and that there was nothing threatening written on the jury list. She also testified that Knight had not made any violent use of the screwdriver or sharpened paper clips, and no violent use of the razor blades, other than hurting himself. She testified that she "got along fine" with Knight.

9

In support of his state habeas application, however, Knight submitted Risley's unsigned affidavit, along with an affidavit of habeas counsel explaining that Risley refused to sign the affidavit. In rejecting Knight's <u>Brady</u> claim, the state habeas court made the following findings of fact and conclusions of law:

[Findings of Fact]

2. The court finds that the affidavit of Cindy Risley, a jailer with the Randall County Jail in Canyon, Texas, attached to Applicant's writ, is not signed nor sworn to.

3. The court finds that, assuming the Risley affidavit is competent evidence, Cindy Risley might possibly have testified to certain conclusions and impressions based entirely on her conversations with Applicant while incarcerated in the Randall County Jail awaiting trial on his capital murder charges and her observations of him as an inmate in the jail. Her testimony might have included opinions such that Applicant was lonely and bored. She might also have testified that Applicant was "abandoned" by his family and that, as a consequence, he had no family support. Risley might have testified that Applicant told her that he was accepting responsibility for killing both victims, even though his co-defendant had killed one of the two named victims, since the co-defendant's family "couldn't handle the death penalty." Risley might have testified to Applicant's loss of control and manifestations of rage and anger while housed as an inmate in the Randall County Jail but that she believed such exhibitions to be an "act." She also might have testified that Applicant made and stored illegal weapons in jail out of boredom and that "discovering" these weapons and turning them over to jail personnel would have afforded him some form of "credit" in the eyes of the jailers.

10

....

5.  The court finds that Cindy Risley was fully available for pre-trial interview with Applicant's lawyers. The court finds no evidence in the record to suggest that Risley was prevented from communicating with Applicant's lawyers or instructed not to do so with the defense team. The court further finds that the totality of Risley's opinions, beliefs and observations were based entirely on her dealings with Applicant as an inmate in the Randall County Jail and on her conversations solely with Applicant while he was incarcerated.

6.  The court finds that those matters described within the unsigned Risley affidavit having to do with her feelings, beliefs, observations and opinions was information not in exclusive possession of law enforcement or the prosecution. The court further finds that this information was fully available to the defense, by way of full and complete interviews with Risley or candid exchange between Applicant and his lawyers.

....

[Conclusions of Law]

7.  The court finds that the source of information allegedly possessed by Cindy Risley was Applicant himself and that the circumstances Risley could have testified to – his alienation from his family, his need for attention and approval from jail personnel, his motivations behind the production of homemade weapons, his disclosure of same to the jailers and his apparent lack of violent tendencies when in Risley's company – were known to Applicant and thus were known to his lawyers and defense staff as well. The rule of <u>Brady v. Maryland</u>, supra, and its progeny does not apply to situations where the information or evidence in question was known to the defense.... Thus, the prosecution did not violate its duty to disclose favorable evidence to the defense in this case when the

11

evidence about Applicant's tendencies and his platonic relationship with Risley was already available and vicariously known to the defense....

8. Because the record is barren of any evidence tending to show that the State possessed exclusive rights to this evidence or that it was suppressed or otherwise withheld from Applicant, his discussion of what Risley could have testified to constitutes a post-conviction bill of exception, a procedure which does not comport with the contemporaneous objection rule....

9. Moreover, even if one were to assume arguendo that the prosecution had failed to disclose evidence from Risley which was favorable in terms of Brady and its progeny, Applicant has not sustained his burden of proving that such evidence was "material."... In this regard, Applicant has failed to establish affirmatively that there is a reasonable probability that, had such evidence been disclosed to the defense, the result of the trial would have been different or that there is a reasonable probability sufficient to undermine confidence in the outcome of the trial as a result of the information provided by Risley. The determination and evaluation of the "materiality" of Risley's information must be made in light of the entire record and in the context of the overall strength of the State's case.... When consideration is given to the entire record and the overall, overwhelming strength of the prosecution's case, there has been no showing by Applicant of a probability sufficient to undermine confidence in the outcome of the trial or more specifically, the answers reached by the jury in response to the special issues submitted to them, as a result of the information or opinions of Cindy Risley.

D

In the federal court proceedings, Knight submitted Risley's signed affidavit and she was called as a witness by Knight. She

12

testified that she signed the affidavit after she was no longer working for Randall County and did not have to worry about losing her job. She testified that Knight was kept in solitary confinement for the safety of himself and others; that Knight had emotional problems and had been abandoned by his family; that he called her "Mom"; that he made and hid weapons because he was bored, but never used the weapons on anybody in the jail; that in her opinion, Knight would not be dangerous under structured, controlled circumstances; and that, if she had been contacted by the defense, she would have talked to them and would have testified. On cross-examination, Risley acknowledged that she did not know of any reason why Knight would be placed in a private cell if sentenced to life imprisonment; and, therefore, she was unable to say whether Knight would be dangerous in the less structured environment of imprisonment in the general population rather than in a private cell.

Risley testified that when she approached her supervisor about state habeas counsel's request to sign an affidavit, he advised her to remember that she was an "at will" employee. Her supervisor testified for the State, and denied making that statement. Witnesses from the Sheriff's Office testified that there was no policy that prohibited employees from speaking with defense counsel or signing an affidavit. Knight's lead trial counsel testified that he thought his investigator had interviewed Risley prior to trial, and that he knew that Knight was fond of Risley.

13

Following the federal evidentiary hearing, the magistrate judge concluded that most, if not all of the information known to Risley, that would have been admissible at trial, was already known to Knight, and that Risley's opinions were, in large part, based on speculation and hearsay. Therefore, Knight failed to rebut the presumptively correct state habeas court finding that Risley's information was available to the defense. The magistrate judge also observed the inconsistency between Knight's allegation, on the one hand, that he developed a very close personal relationship with Risley during the two years he was incarcerated in the Randall County Jail, and his contradictory allegation, on the other hand, that he was not aware of her existence as a potential defense witness, or that she had a favorable opinion of him. The magistrate judge concluded that Risley's testimony would have been of questionable evidentiary value, and that there was not a reasonable probability that her testimony would have affected the outcome of this case in the light of the overwhelming evidence against Knight, including the heinous execution-style murders of the victims after holding them hostage for an extended period of time. According to the magistrate judge, the evidence of Knight's acts, while incarcerated awaiting trial, including threats against other inmates, plans to fake insanity, and his concealment of weapons in his cell, greatly outweighed evidence of Risley's opinion that he would not constitute a continuing threat to society

14

if given a life sentence.  The district court adopted the magistrate judge's recommendation.

E

Based on our review of the state and federal habeas records, we conclude that the state court's decision to deny relief is not an unreasonable application of <u>Brady</u>.  The evidence presented at the federal evidentiary hearing merely reinforces the state habeas court's determination that Risley's information was available to the defense and, therefore, was not suppressed by the State. Accordingly, we affirm the district court's denial of habeas relief on this claim.

IV

A

Next, Knight contends that his trial counsel rendered ineffective assistance by failing adequately to investigate and present evidence of Knight's mental condition and other mitigating circumstances.  Knight contends that trial counsel or counsel's investigator had in their files substantial mitigating evidence that was never developed, including the following:  he drowned as a child and suffered anoxia; he grew up in dysfunctional and disadvantaged circumstances; he suffered personality disorders and probably an organic brain condition that limited his ability to control inappropriate impulses; the psychological expert retained for trial (Dr. Price) was not aware of an earlier psychological evaluation by Dr. Rumage that suggested the possibility that Knight

15

suffered from organic brain damage;[3] counsel failed to interview Risley; and, although counsel was not hampered by a lack of resources, Knight was not tested or psychologically evaluated until after jury selection began.

Knight asserts that Dr. Paula Lundberg-Love, the expert retained by his habeas counsel, could have testified that Knight suffers from psychoactive substance abuse and passive-aggressive personality disorder; that Dr. Rumage's evaluation of Knight at age nine suggested that he suffered from organic brain dysfunction; that Dr. Price's clinical notes raise a suspicion of organic brain dysfunction (Knight suffered a number of head injuries as a child, he drowned when he was a child, and he had been diagnosed with attention deficit disorder); that organic brain dysfunction prevents the brain from functioning properly and removes the ability to control impulses; that what little control Knight had was erased by his consumption of alcohol; that his medical condition (attention deficit disorder) creates a propensity to

_____

[3]Dr. Rumage evaluated Knight when he was nine years old. In her report, she requested a comprehensive neurological evaluation to determine the existence of organic brain dysfunction and possible treatment. Although Knight asserts that such testing was not done, the medical records attached as exhibits to the State's answer in the state habeas proceedings contradict that assertion. Knight further asserts that trial counsel's retained neuropsychologist, Dr. Price, was not given a copy of the Rumage report, because they did not find a copy of the Rumage report in his file. However, trial counsel's affidavit, which was credited by the state habeas trial court, states that Dr. Price was given a copy of the Rumage report and the other medical records, including the follow-up neurological testing performed on Knight at Dr. Rumage's request.

16

abuse alcohol; that, because of his medical condition, Knight was unable to suppress his emotional impulses; that his condition is treatable; and that, with the right medication and abstinence from alcohol, he can control his impulses and there is little probability that he would be a continuing threat to society.

Lisa Milstein, the investigator retained by Knight's habeas counsel, submitted an affidavit to the state habeas court in which she stated that she found the following mitigating evidence: Knight grew up in a disadvantaged environment and had a background of abuse and emotional neglect -- his mother and father divorced; his mother and step-father divorced; his mother failed to discipline her children and ignored them; no one in Knight's family visited him while he was in jail awaiting trial; and Knight's family was centered on money and efforts to please his grandmother, who had money.

Knight asserts that Risley also had mitigating evidence and that, although her name appeared on the prosecution's witness list, his trial counsel did not interview Risley and did not know whether his court-appointed investigator had interviewed her.

B

To prevail on his ineffective assistance claim, Knight must show that counsel rendered deficient performance, and that the defense was prejudiced by the deficiency. Strickland v. Washington, 466 U.S. 668, 687 (1984). Counsel's performance was deficient if it "fell below an objective standard of

reasonableness." Id. at 688. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id.

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Id. at 690-91. "[O]ur principal concern in deciding whether [Knight's counsel] exercised reasonable professional judgment is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [Knight's] background *was itself reasonable*." Wiggins v. Smith, 539 U.S. 510, 522-23 (2003) (internal quotations and brackets omitted; emphasis in original). "In assessing counsel's investigation, we must conduct an objective review of their performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." Id. at 523 (internal

18

quotations omitted).  We now turn to recount the investigation conducted by counsel.

C

Jon Waggoner, who was Knight's lead counsel at trial, submitted an affidavit in the state habeas proceedings.  In that affidavit, he stated that he retained an investigator, Kathy Garrison, to assist him in locating mitigating evidence.  Based on their interviews with Knight, they learned that he had spent his formative years in southern Louisiana, around the New Orleans area.  Waggoner and Garrison traveled to New Orleans in early August 1993 to interview people who knew Knight and to secure medical and educational records.  Waggoner stated that he interviewed a nun who had taught Knight.  She told Waggoner that Knight was a disruptive child who had behavioral problems, but normal intelligence.  Garrison reported to Waggoner that she had talked to some of Knight's friends and an elementary school teacher.  While those people expressed some sympathy toward Knight, they also remembered many unpleasant things about Knight, including multiple allegations of theft, lying, loss of temper, rage, behavioral problems, threatening behavior, lack of empathy for others, and disciplinary problems in school.  Garrison also obtained educational and aptitude testing records from schools and health care providers.  Waggoner stated that he reviewed those records and concluded that they were of little probative, mitigating value.  Waggoner also obtained Knight's medical records from the Naval Regional Medical

19

Center in New Orleans covering the period April 14, 1975, through August 25, 1977. Those records showed that Knight had been referred for a neurological work-up due to his poor performance in school. Waggoner stated that the test results were "normal", but that he provided a copy of the psychological test report performed by Dr. Rumage to Dr. Price, the neuropsychologist he retained to evaluate Knight.

Waggoner stated that he and Garrison concluded that none of the individuals they contacted would be able to provide any substantive mitigating evidence and that, even if they could be called to testify, the risk was too great for fear of opening the door to damaging testimony regarding Knight's admittedly anti-social behavior as a child.

Waggoner stated in his affidavit that he also visited with Knight's mother and grandmother, neither of whom were helpful. Knight's mother stated that she did not wish to help her son, and his grandmother felt the same way. Prior to the beginning of Knight's trial, Knight's mother and grandmother moved from Amarillo during the middle of the night, and Waggoner did not know where they went and thus could not contact them.

Waggoner stated that he retained Dr. J. Randall Price, a neuropsychologist from Dallas, to examine Knight for the purpose of developing mitigating evidence. He stated that he and Garrison provided Dr. Price with copies of all of the documentation they collected during their trip to New Orleans, including the medical

records from the Naval Regional Medical Center and the psychological evaluation by Dr. Rumage. Dr. Price examined Knight in the Randall County Jail in early September 1993. Waggoner met with Dr. Price after the examination. Dr. Price told Waggoner that he believed that Knight exhibited a classic anti-social personality disorder and that, if pressed, he would be compelled to testify accordingly. Dr. Price described Knight's statements about how he liked to be "scared" and that he enjoyed going into people's homes and cars for the money and excitement. Dr. Price felt that the results of the personality test administered to Knight were exaggerated, suggesting that Knight had engaged in malingering. Dr. Price also pointed out that Knight's conduct in jail was not good, including threats against other inmates and possession of a shank and other contraband. Dr. Price did not believe that Knight was brain-damaged. He based that opinion on the fact that Knight's IQ scores were not remarkable and that, if there had been brain damage, there would have been much more deviation in those scores. Dr. Price believed that Knight had a learning disability that probably accounted for his terrible academic performance in school. Waggoner stated that Dr. Price informed him that further neurological testing was not justified. Dr. Price told Waggoner that, if called to testify, he would have to opine that Knight could be termed a future danger to others.

Waggoner explained his decision not to present any evidence at the punishment phase as follows:

21

At trial, I was faced with a difficult situation. In actuality, I had no mitigating evidence on behalf of Knight. His family abandoned him. The medical and educational records covering his early years in the New Orleans area revealed no objective evidence of brain damage or mental illness. If anything, the records revealed several instances of classic anti-social behavior. Even his own friends from the New Orleans area would, if compelled to, testify to a variety of anti-social behaviors which would have militated in favor of the death penalty. Dr. Price recommended no additional testing. Mr. Knight's behavior in jail was replete with instances of rules violations, threats against other inmates and possession of weapons. Relying on Dr. Price's recommendations and the totality of my experience in over 100 jury trials, it was my studied decision not to present any of the evidence which we had discovered (for fear of opening the door to even more damaging evidence) and rest at punishment without calling any witnesses.

....

I believe that I and my investigator followed up on all leads and that we acted fully on the mitigating evidence which we possessed both before and during trial. I know for a fact that I provided a copy of the Nancy Rumage report to Dr. Price prior to his evaluation of Knight and that my decision not to follow-up with any additional psychological testing was the direct result of my reliance on the advice and opinions given to me by Dr. Price. I and Kathy Garrison investigated all possible mental health issues existing at the time prior to trial.

Kathy Garrison, the private investigator who was appointed to assist Waggoner with Knight's defense, also submitted an affidavit in the state habeas proceedings. She stated that she talked to Knight's family friends, former teachers, and boyhood friends, all

22

of whom described Knight's unacceptable behavior, including stealing, temper tantrums, chronic and habitual lying, disruptive behavior in the classroom, and fighting. She also interviewed Philip Wagner, who professed to be a good friend of Knight, but who described Knight as a "compulsive liar" who had engaged in an escalating pattern of criminal activity during the time Wagner spent with him. Wagner told her that he feared Knight and that Knight had no remorse for anything. She also interviewed Knight's mother and grandmother, neither of whom wanted to help Knight.

D

The state habeas trial court made the following findings of fact with respect to Knight's ineffective assistance claim:

> 9. The court finds that Dr. Paula Lundberg-Love is not a forensic psychologist but rather a psychological assistant with licensure occurring in 1986. Her field of expertise is in pharmacology and drug/alcohol abuse.
>
> 10. The court finds that Dr. Randy Price is an experienced forensic neuropsychologist who has been qualified as an expert in the district courts of both Potter and Randall counties.
>
> 11. The court finds that trial counsel Jon Waggoner had in his possession before he retained the services of Dr. Price the medical records from the Naval Regional Medical Center in New Orleans, dated April 14, 1975 through August 25, 1977.... These records contained certain findings of medical tests conducted by medical personnel there at the Naval Regional Medical Center as well as a psychological report completed by Nancy Rumage, dated August 17, 1977.

23

12. The court finds that Jon Waggoner provided these records to Dr. Price prior to his examination of Applicant in the Randall County Jail in early September of 1993.

13. The court finds that Applicant made full and frank disclosure to Dr. Price during the interview process and admitted to the elements of the crime. The court further finds that Applicant made certain statements to Dr. Price that can only be characterized as evidence of anti-social behavior and thought processes, particularly the comments that Applicant enjoyed breaking into people's homes and cars because he "liked the excitement and the money was great."

14. The court finds that Dr. Price's representations to Jon Waggoner that Applicant was not brain-damaged and that he most likely represented a future danger to society are adequately supported by the record in this case, particularly in the clinical findings contained within the medical records indicating normal IQ scores, his anti-social statements made to Dr. Price and other inmates who testified at trial, his documented bad behavior while incarcerated in the Randall County Jail and the skewed scores on the MMPI administered by Dr. Price, a deviation Dr. Price attributed to malingering on Applicant's part.

15. The court finds that no further neurological or psychological testing was necessary in this case, particularly after Dr. Price's examination in September of 1993 and after his report made to Jon Waggoner shortly thereafter.

16. The court finds that if Dr. Price had been called as a witness by Applicant, he could have been compelled to testify before the jury that Applicant might very well commit future acts of criminal violence against others and therefore be considered a future danger to others.

24

17. The court finds that Lundberg-Love's conclusion that Applicant may have experienced anoxia which could have resulted in brain damage to be anecdotal in nature only and not supported by any available medical records. The court finds that Lundberg-Love found Applicant's IQ scores to be in the low-normal range and that he may have a learning disability, a finding confirmed by Dr. Price. The court further finds that the 1977 Rumage report does not contain indicia that Applicant exhibited signs of brain damage and that any conclusions drawn by Lundberg-Love [not] confirming that conclusion are not credible or supported by the record.

18. The court finds that Lundberg-Love's opinion that the MMPI-2 test results collected by Dr. Price were invalid is not credible. The court further finds that Lundberg-Love is not professionally qualified to interpret these results and does so only by guesswork and supposition. The court further finds that Dr. Price's notes do not support the conclusion that there is the presence of organic brain damage or cerebral dysfunction, notwithstanding Lundberg-Love's feelings.

19. The court finds that Lundberg-Love's opinion that Applicant suffers from an organic brain dysfunction, otherwise referred to as Cognitive Disorder Not Otherwise Specified (NOS), is anecdotal in nature and not supported by objective findings in the record.

20. The court finds that Applicant had abused alcohol in the past and probably could be considered an alcoholic. The court finds that the Price notes support the conclusion that Applicant drank alcohol heavily during the commission of the offense for which he was convicted.

21. The court finds that court-appointed trial counsel Jon Waggoner traveled to New Orleans, Louisiana in August of 1993 in an effort to investigate any mitigating circumstances in the life and background of Applicant. In this endeavor, trial counsel,

25

along with his court-appointed investigator Kathy Garrison, sought to secure documentation along these lines as well as interview individuals who knew Applicant or who had any interaction with him through family, schooling or employment.

22. The court finds that Waggoner and Garrison talked to several individuals in and around the New Orleans area who had either been a childhood friend, a teacher or relative of Applicant. These individuals expressed sympathy for Knight's plight but all described Applicant's behavior as unacceptable and that he was involved in stealing, loss of temper and emotional control, chronic and habitual lying, disruptive and inappropriate behavior while in a schoolroom setting and fighting with others. The court further finds that Garrison interviewed one good friend of Applicant who described Applicant as a "compulsive liar" and one who was engaged in an escalating pattern of criminal activity. The court also finds that Waggoner and Garrison obtained limited medical records on Applicant from which little, if any, mitigating evidence could be derived, a conclusion confirmed by the opinions reached by Dr. Price after his independent review of the records the succeeding month.

23. The court finds that Waggoner also made contact with Applicant's family, specifically his biological mother and grandmother, in an effort to develop some mitigating evidence for the punishment phase of the trial. The court finds that both Applicant's mother and grandmother openly refused to assist defense counsel in any meaningful manner and did, in fact, physically remove themselves from the jurisdiction at the time of trial so as to refuse to assist Applicant. The court finds that Applicant's mother and grandmother left no information behind which would have assisted Waggoner in locating them for purposes of testifying at trial.

26

24.    The court finds that neither Waggoner nor Garrison were able to secure employment records from the New Orleans area or from anywhere else because Applicant had never worked long enough at a given job so as to give rise to an employment record.

25.    The court finds that Waggoner had in his possession summaries of his interviews with family members, associates, teachers and childhood friends of Applicant; medical records on Applicant from a naval clinic in New Orleans dating back to 1975-77; and the summaries of Garrison's interviews with individuals there in the New Orleans-Slidell area when he met with Dr. Randy Price in September, 1993.  The court further finds that Waggoner shared these materials with Dr. Price at the time of Price's evaluation of Applicant there at the Randall County Jail in September, 1993.  The court finds that Waggoner, having provided this information to his retained expert, appropriately relied upon the recommendations made by Dr. Price and that these recommendations and observations made by Dr. Price have ample support in the record.  The court further finds that the failure to secure additional psychological testing was grounded on the absence of evidence suggesting the need for same as well as upon the clear recommendation made by Dr. Price.

26.    The court finds that Waggoner was not required to seek professional, expert assistance until and when he could find one who would testify consistent with those opinions and beliefs held by Paula Lundberg-Love.

27.    The court finds that Applicant and the State differ significantly on the meaning of the scant medical evidence in this case.  However, the court further finds that the existing medical evidence was provided to Applicant's duly appointed trial counsel and retained expert and that trial counsel's strategic decision not to present the evidence he and his investigator had uncovered during the discovery phase of pre-trial preparation

was plausible for the reason that [t]o have done so would have opened the door to additional, damaging punishment evidence. Trial counsel's decision to forego the introduction of any of this evidence was additionally plausible given his good faith reliance on the opinions of his qualified, experienced retained expert.

28. The court finds that regardless of the decision to forego introduction of any of the potential mitigating evidence discovered by Waggoner and Garrison prior to trial, trial counsel nevertheless developed some evidence in support of the following themes which he argued to the jury in an effort to persuade the panel to answer the special issues in such a manner so as to avoid the death penalty: that there was insufficient evidence to justify imposition of the death penalty based on the plain facts of the case; that there was a paucity of overt violence [in] Applicant's past, excluding the offense for which he was convicted; that Applicant's jail tenure was free of any violence specifically directed toward any identifiable jailer or inmate; that Applicant's criminal background consisted of property offenses; that Knight was a very young man who stood a good chance of being rehabilitated if assessed a sentence of life in prison; that the jury could exercise any degree of residual doubt that they might harbor in favor of Applicant, given the role of his co-defendant in the crime (for which he received a life sentence, thereby prompting a proportionality review from the jury which might have resulted in a life sentence); and finally reminding the jury that it had the power to engage in a form of "jury nullification" and grant Applicant mercy, notwithstanding the weight of evidence suggesting imposition of the death penalty. The court finds that these jury arguments were properly made and were supported by evidence in the trial record.

29. The court finds that trial counsel and his investigator followed up on all possible investigatory leads and acted fully

28

and completely on the mitigating evidence which either possessed before and during trial. The court finds that Waggoner and Garrison investigated all possible mental health issues at the time and prior to trial. The court further finds that Waggoner and Garrison did not fail to investigate adequately and/or present evidence concerning Applicant's dysfunctional family life because Applicant's family refused to cooperate with Applicant's trial counsel and his investigator prior to and during trial. The court finds that the presentation of any evidence concerning Applicant's alleged "dysfunctional" family life would have required the cooperation of both his mother and grandmother and any other immediate family members, none of whom had any positive, helpful information to share with the defense.

Applying Strickland, the state habeas trial court concluded that Knight had failed to show deficient performance, much less harm, stating:

The affidavits of Jon Waggoner and Kathy Garrison establish that trial counsel and those under his direction and control instituted a diligent investigation into the circumstances and background of Applicant. They followed up on all identifiable sources which did or could have led to the discovery of relevant mental health information. Trial counsel adequately investigated all known mental health sources before Applicant's trial. He relied on representations made to him by Applicant, Applicant's family members and the available documentary evidence existing at that time. Applicant's complaints about trial counsel's performance center on the manner in which trial counsel and his retained expert interpreted the available mental health information and to what use, if any, this evidence could have been utilized. It is also apparent from the affidavits and documentary exhibits included within the record that defense counsel did act upon the available mental health information when they

29

provided same to the retained psychological expert Dr. Price. Waggoner's affidavit dispels any doubt that this report and other relevant information was not provided to Dr. Price. The available affidavits and exhibits also make clear that trial counsel was informed by his own expert that there was sufficient information and evidence to support findings that Applicant did not suffer from brain damage, that the MMPI scores were not valid (not due to the timing of the administration of the test but rather to malingering on Applicant's part) and that Applicant's background and thought processes were consistent with a diagnosis of sociopathy. Thus, trial counsel's decision not to pursue further psychological testing was an informed one and represented a logical, plausible decision under all the facts and circumstances existing at that time. Further, his decision not to present any expert testimony through Dr. Price was indeed plausible and sound since Dr. Price had informed trial counsel that he would render an opinion, if called upon, that Applicant could very well be considered to be a future danger to others. By electing to forego presenting Dr. Price, trial counsel avoided opening the door to damaging evidence as illuminated within Dr. Price's handwritten notes and further, avoided having his own retained expert compelled to give an opinion totally antithetical to the thrust of Applicant's defense during the punishment phase. Trial counsel's actions and decisions taken during this phase of pre-trial and trial were eminently reasonable. They constituted sound trial strategy, notwithstanding Applicant's complaints.

.... [T]he undisputed facts in the record establish that trial counsel entered the punishment phase of the trial knowing that Applicant's family had abandoned him, his own expert had concluded that Applicant's behavior was perfectly consistent with that of a sociopath, that there was insufficient, objective evidence to support an argument that Applicant suffered from any somatic condition

30

which might explain his violent or otherwise aberrant behavior, that Applicant had no employment history nor possessed any special talents, that Applicant's own friends could be compelled to testify to a wide range of antisocial acts and behavior and that his behavior in the Randall County Jail was very poor, regardless of any ameliorating effect that Cindy Risley's anticipated testimony might have provided. Given the fact that those family members in the best position to provide mitigating testimony regarding Applicant's regrettable family life had refused to assist trial counsel (and had in fact physically moved from without the jurisdiction during trial, presumably to avoid testifying altogether), it is understandable that no such family life evidence was presented since there was no competent witness to so testify, save and except Applicant himself. Moreover, even if it is accepted for purposes of argument, that trial counsel should have known of Risley's anticipated testimony, those matters set out in the unsigned Risley affidavit in no way offset or neutralize Applicant's bad behavior while incarcerated in the Randall County Jail. Trial counsel's decision to forego any punishment evidence was reached in a professional manner after careful deliberation. This decision was prudent. Moreover, the punishment argument made by trial counsel was likewise a proper response to the totality of the evidence presented by the State and was supported by the record. Trial counsel's assistance was not deficient nor can it be concluded that his performance prejudiced Applicant's punishment case. There is simply no evidence to indicate that the result of this trial would have been different if such alleged mitigating evidence regarding family life or jail behavior identified by Applicant had, in fact, existed and counsel had presented it.

E

At the federal evidentiary hearing, Risley testified that she was not contacted by defense counsel or his investigator. Waggoner testified that he knew prior to trial that Knight was fond of Risley and that he thought his investigator had interviewed Risley. He conceded that, in hindsight, it would not have been a bad idea for him to have interviewed Risley. He testified further, however, that he did not see a great deal of value in the information presented in Risley's affidavit.

The district court held that Knight had failed to show that trial counsel acted unreasonably in accepting Dr. Price's report and following Dr. Price's recommendation when he decided not to offer evidence of Knight's mental condition. The court explained that trial counsel sought and obtained a mental evaluation by a competent professional; he was faced with potential evidence from his own expert that Knight exhibited classic anti-social personality traits and that he was not brain-damaged; and his expert, if pressed, could testify that he was a future danger to others. The court stated that it could not say, even in hindsight, that counsel erroneously decided that the potential detriment in offering such evidence outweighed any possible benefit to offering it.

The district court also concluded that Knight was not prejudiced, because any evidence of mental defect, if offered, and assuming it did not backfire, would not have affected the outcome of the punishment phase. With respect to Risley's proposed

32

testimony, the district court held that Knight failed to show that it was material. The court stated that much of the testimony Risley could have provided was based on hearsay statements made by Knight; and the portion of her testimony that might have been admissible at trial would not have constituted sufficient mitigation evidence to be material to the issue of future dangerousness and certainly would not have had any impact on the jury's determination of the special issues. The court noted that Risley also admitted that she had filed an incident report against Knight for a disciplinary infraction in June 1993, shortly before his trial. The court reasoned that, by allowing the State to call Risley as a witness at trial and then eliciting testimony from her on cross-examination that Knight had not used any of the weapons found in his cell against anyone and that she got along fine with him, trial counsel was able to limit the State's questioning on redirect and avoid introduction of the damaging evidence of future dangerousness that the State adduced on cross-examination at the federal evidentiary hearing.

The district court noted that trial counsel and his private investigator had traveled to Louisiana to investigate Knight's background, seeking potential mitigating evidence. Despite their efforts, no useful mitigating evidence was discovered. Witnesses interviewed by counsel and his investigator, while somewhat sympathetic to Knight's predicament, possessed knowledge which, if

33

developed at trial, could potentially assist the prosecution in presenting Knight as anti-social.

F

Based on our review of the record, we conclude that the state court did not unreasonably apply <u>Strickland</u>. The record establishes that Knight's counsel and his investigator conducted a diligent and thorough investigation of Knight's background. The fact that they were unable to find any useful mitigating evidence does not render counsel's performance deficient. Furthermore, counsel did not perform deficiently by relying on the expert neuropsychologist's recommendation that no further testing needed to be performed. In sum, Knight's counsel had very little to work with, and made an informed strategic decision that Knight's case would not have been helped by the presentation of the evidence uncovered during his investigation, because it would have opened the door to even more damaging evidence about Knight's anti-social behavior.

We further conclude that, even if counsel had presented the evidence uncovered by his habeas counsel, there is not a reasonable probability that the jury would have answered the special issues in a different way. The evidence of the kidnaping, robbery, and brutal execution of the Werners is simply so horrible and cruel that it is extremely unlikely that a reasonable juror would have been willing to spare Knight's life, even if presented with the evidence that he now says trial counsel should have presented. We

34

therefore affirm the district court's denial of habeas relief on Knight's ineffective assistance claims.

V

The final claim for which we granted a COA is Knight's contention that his rights were violated when the trial judge granted the State's challenge for cause and excluded prospective juror David Johnson. The Supreme Court has held that prospective jurors may be excluded for cause if they "would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or ... that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt." Witherspoon v. Illinois, 391 U.S. 510, 522 n.21 (1968). Furthermore, a challenge for cause is properly granted if a prospective juror's personal feelings about the death penalty would "prevent or substantially impair the performance of [his] duties as [a juror] at the sentencing phase of the trial." Lockhart v. McCree, 476 U.S. 162, 165 (1986). A prospective juror, however, may not be excluded for cause simply because he may be "hesitant in [his] ability to sentence a defendant to death." Morgan v. Illinois, 504 U.S. 719, 732 (1992) (citing Witherspoon, 391 U.S. at 522 n.21). The trial court's finding of juror bias is entitled to a presumption of correctness and the petitioner has the burden of rebutting that finding by clear and convincing evidence.

35

<u>See</u> 28 U.S.C. § 2254(e)(1); <u>Cardenas v. Dretke</u>, 405 F.3d 244, 250 (5th Cir. 2005).

Knight argues that, although Johnson stated that he personally had reservations about the death penalty, he also stated that, if the evidence demanded it, he could answer the punishment issues in a manner that would require imposition of the death penalty. According to Knight, Johnson's answers wavered only after the prosecutor repeatedly questioned him and attempted to confuse him. Knight contends that the state court and the district court unreasonably applied Supreme Court precedent by failing to consider the voir dire examination as a whole and by not considering the probable effect of the prosecutor's obvious attempts to cause Johnson to vacillate.

On direct appeal, the Texas Court of Criminal Appeals examined Johnson's voir dire testimony as a whole, quoting it at length. The court noted that, throughout lengthy questioning, Johnson was unable to answer the question whether he could put aside his personal reservations about the death penalty when answering the special issues. In addition, when the prosecutor asked Johnson whether he would require the State to meet a higher burden in proving the special issues than the reasonable doubt standard, Johnson answered that he would require proof "beyond any doubt." The court further noted that defense counsel's attempt to rehabilitate Johnson on the burden of proof led to further confused and sometimes contradictory answers and, in fact, Johnson again

36

stated that he would not be able to answer the special issues according to his oath and the trial court's instructions. The court concluded that the trial court did not abuse its discretion in granting the State's challenge for cause because Johnson's views on the death penalty would prevent or substantially impair the performance of his duties as a juror in accordance with the court's instructions and his oath.

Based on our review of Johnson's voir dire testimony, we conclude that Knight has failed to rebut the state court's factual finding that Johnson's views about the death penalty would prevent or substantially impair the performance of his duties as a juror in accordance with his oath and the instructions of the court. We conclude further that the state courts did not unreasonably apply clearly established federal law in rejecting Knight's claim. We therefore affirm the district court's denial of habeas relief.

## VI

For the foregoing reasons, the judgment of the district court is

AFFIRMED.