

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. AP-76,176

**MICHAEL DEAN GONZALES, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM CAUSE NO. D-23,730 IN THE 358TH JUDICIAL DISTRICT COURT ECTOR COUNTY

**JOHNSON, J., filed a dissenting opinion.**

### DISSENTING OPINION

Our concern ought not be for those who are not selected for the jury, but for those who are.

*See, e.g., Jones v. State*, 982 S.W.2d 386, 394 (courts should liberally grant challenges for cause: "The venire comprises so many jurors who are clearly qualified that it is unnecessary to err by denying a challenge for cause on a close question."); *see also Morgan v. Illinois,* 504 U.S. 719, 736

(1992) (the risk of impaneling a juror who would impose death regardless of the facts and circumstances of the offense is unacceptable in light of the ease with which the risk can be minimized). "The Sixth Amendment guarantee to trial by an impartial jury includes the right to have jurors that can follow the law and consider the evidence. In other words, the jury must be able to make an independent determination based on the facts presented at trial, not on any personal opinions they may have." *Raby v. State*, 970 S.W.2d 1, 10 (Tex. Crim. App. 1998). In capital cases, we must be especially vigilant that strong opinions, for or against the death penalty, are not glossed over by agreement with the common question, "Can you set aside your personal feelings and follow the instructions from the judge?" *See Morgan*, 504 U.S. at 734–39. While this Court has recognized that "complete impartiality cannot be realized as long as human beings are called upon to be jurors,"[1] doubt about a prospective juror's ability to be impartial should result in a grant of a challenge for cause. *Jones*, 982 S.W.2d at 391, 394.

A reviewing court must look at the entire record of voir dire to determine if the evidence is sufficient to support the court's ruling on a challenge for cause. *Feldman v. State,* 71 S.W.3d 738, 744 (Tex. Crim. App. 2002). This Court has said that the reviewing court should afford great deference to the trial court's decision because the trial judge is present to observe the demeanor of prospective jurors and to listen to tones of voice. *Id.* Particular deference is due when the prospective juror's answers are vacillating, unclear, or contradictory. *Smith v. State,* 297 S.W.3d 260, 268 (Tex. Crim. App. 2009).

Yet, deference is not absolute. The standard for review is whether the trial court abused its discretion when it overruled a challenge for cause. *Id.* In making this decision, the reviewing court

---

[1] *Ladd v. State*, 3 S.W.3d 547, 560 (Tex. Crim. App. 1999) (quoting *Jones*, 982 S.W.2d at 389).

examines the voir dire of the prospective juror as a whole and decides whether the record shows that the prospective juror's convictions will interfere with the ability to serve as a juror and to abide by the oath. *Curry v. State,* 910 S.W.2d 490, 493 (Tex. Crim. App. 1989) (citing *Johnson v. State*, 773 S.W.2d. 322, 327–28 (Tex. Crim. App. 1989)). If a juror states that he believes that he can set aside any influences and biases he may have and the trial court overrules a challenge for cause, its decision will be reviewed in light of all of the answers the prospective juror gave. *Anderson v. State*, 633 S.W.2d 851, 854 (Tex. Crim. App. 1982).

A prospective juror is challengeable for cause if he or she has a bias or prejudice against the defendant or against the law upon which either the state or the defense is entitled to rely. TEX. CODE CRIM. PROC. art. 35.16(a)(9) & (c)(2); *Gardner v. State,* 306 S.W.3d 274, 295 (Tex. Crim. App. 2009). The test is whether the prospective juror's bias or prejudice would substantially impair his or her ability to carry out the juror's duties in accordance with the court's instructions and the juror's oath. *Wainwright v. Witt,* 469 U.S. 412, 424 (1985). This standard does not require that a juror's bias be proved with "unmistakable clarity" because many prospective jurors simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear." *Id.* Some prospective jurors may not know how they will react when faced with imposing the death sentence, or they may be unable to articulate their true feelings. *Id.* at 425; *see also Bell v. State,* 724 S.W.2d 780, 794 (Tex. Crim. App. 1986).

Based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who will automatically vote for the death penalty. *Morgan*, 504 U.S. at 729. Because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating

circumstances is entirely irrelevant to such a juror. *Id.* If even one such juror is empaneled and the death sentence is imposed, the state is disentitled to execute the sentence. *Id. See also Feldman*, 71 S.W.3d at 744.

Before a prospective juror may be excused for cause on this basis, the law must be explained to the juror, and the juror must be asked whether he or she can follow that law, regardless of personal views. *Id.* In order to establish that the challenge for cause is proper, the proponent of the challenge must show that the prospective juror understood the requirements of the law and could not overcome personal prejudice well enough to follow the law. *Id.* at 747. *See e.g., Howard v. State,* 941 S.W.2d 102, 128 n.2 (Tex. Crim. App. 1996); *Harris v. State*, 784 S.W.2d 5, 25 (Tex. Crim. App. 1989). General questions about fairness and ability to follow the law and the court's instructions are not enough; the court must assess the effects of bias more specifically. *See Morgan,* 504 U.S. at 734–35 (some jurors may in all truth and candor respond that they will be fair and impartial, personally confident that their views are fair and impartial, while leaving the specific concern—whether they are unalterably in favor of or opposed to the death penalty—unprobed).

In his second point of error, appellant complains of the trial court's failure to grant a challenge for cause against Sarah Murdock. Early in the state's voir dire, Murdock said, "I believe in the death penalty."[2] She stated that leniency under special issue two wasn't fair to the victim's family.[3] In her answers on the juror questionnaire, she checked the box stating that she believed that

---

[2] XVIII R.R. at 39.

[3] XVIII R.R. at 42.

anyone convicted of capital murder should be sentenced to death, regardless of the special issues.[4]
Counsel for the state explained that there was a concern that, because she was opposed to parole,
ever, that she "would be unwilling to answer the question in such a way that a life sentence would
result." Her answer was, "I just–I can't change the way I think."[5]

The state questioned her about her response to the question about being able to consider
leniency in a brutal murder: "somewhat disagree." When asked what was going through her mind
when she checked that box, she stated her concern that "the victims have no rights."[6]

Counsel for appellant began his voir dire by asking if Murdock believed that the death
penalty should be the rule rather than an exception. She agreed.[7] She also agreed that she believed
strongly in an eye for an eye: someone who kills should also die.[8]

Counsel then asked her about her choice of checking a box indicating she is strongly in favor
of the death penalty for every homicide case. Again, she agreed that that was her position.[9] She also
agreed that she believed that anyone convicted of capital murder should be sentenced to death,
regardless of the answers to the special issues.[10] On question 114, what is the best argument for the

---

[4] XVIII R.R. at 44. She also checked an answer that indicated that she thought that all capital murders should be punished by life in prison. The state pointed out the inconsistency with her answer indicating that anyone convicted of capital murder should be sentenced to death, regardless of the special issues. Murdock agreed that she should not have checked the life-in-prison box. XVIII R.R. at 48–49.

[5] XVIII R.R. at 45–46.

[6] XVIII R.R. at 52–53.

[7] XVIII R.R. at 58–59.

[8] XVIII R.R. at 59–60.

[9] XVIII R.R. at 60.

[10] XVIII R.R. at 61, 63.

death penalty, she wrote that a conviction for murder should result in a death sentence. On question 115, what is the best argument against the death penalty, she wrote, "None." On question 116, what is the best argument for a life sentence, she wrote, "None." On question 117, what is the best argument against a life sentence, she wrote, "Same as number 114."[11] In response to questions about whether she could follow the trial court's instruction not to consider appellant's failure to testify or express remorse and whether she would put the matter out of her mind, she said, "No, I wouldn't. I wouldn't put it out of my mind."[12] In the ensuing discussion, she affirmed that she would require a show of remorse from appellant.

> Q. So even if the judge were to instruct you that you must–you could not consider the defendant's failure to testify for any purpose whatsoever, that particular portion of the charge is something you couldn't follow, or you are not certain you could follow.
>
> A. Yes. If there was no remorse in it, no, I couldn't.
>
> Q. And I am talking about remorse from the witness stand in open court. Okay?
>
> A. Uh-huh.
>
> Q. You would have to hear something like that, or would consider Mr. Gonzales's failure to testify?
>
> A. Yes.[13]
>
> Counsel for appellant asked about the special issues.
>
> Q. On addressing issue number one, whether Michael Dean Gonzales is a future danger, the State has to prove that to you beyond a reasonable doubt. My question to you is suppose the State does present evidence to you that he is a future danger, but doesn't prove it in your mind beyond a reasonable doubt. Okay?

---

[11] XVIII R.R. at 63–64.

[12] XVIII R.R. at 65–66.

[13] XVIII R.R. at 66–67.

A. Uh-huh.

Q. They present some evidence but in your mind it falls short of proof beyond a reasonable doubt.

A. Yes.

Q. Would you require the defense to present some evidence that Michael Dean Gonzales is not a future danger before you could answer this issue no? Do you see what I am saying?

A. Uh-huh. Yes.

Q. Again, let me just make sure I understand what you are saying. You are saying that if the State did not prove that Michael Gonzales was a future danger but presented some evidence, before you could answer no to this special issue, you would want the defense to present to you some evidence that he was not a future danger; correct?

A. Yes.[14]

Murdock was uncertain as to the difference between possibility and probability[15] and agreed that the possibility that appellant might be released on parole in 40 years would affect her answers to the special issues.

On redirect examination, counsel for the state asked a series of questions, repeatedly asking Murdock if she understood the law. The state then asked, "[I]f you take the oath to render a true verdict on the law and the evidence, can you do that despite your feelings about parole?"[16] She answered, "Yes." The state also posed a question about testimony from the defendant: "Can you think of a reason why a defendant might not testify at his defense in the case? Aside from the fact that he is guilty or he is not remorseful, some reason that would not necessarily work against him."

[14] XVIII R.R. at 69–70.

[15] XVIII R.R. at 73–74.

[16] XVIII R.R. at 81.

She answered, "No, I don't," then, "I can't."[17] The discussion continued, with the state suggesting possible scenarios in which a defendant might not testify, and with Murdock responding that she understood the state's suggestions of reasons for choosing not to testify. The state ended the discussion by saying, "Do you follow that law?" She answered, "Yes, I do."[18] Her answer is ambiguous; did she follow the explanation, or did she agree that she would follow the instruction. The state did not clarify her answer.

The next series of exchanges followed the same pattern, with the state explaining the law, Murdock indicating that she understood his point and saying that she was beginning to understand, and the state getting her to agree that she could follow the juror oath.[19] The state did not question Murdock further on her stated position that all homicides should be capital, that mitigation evidence was irrelevant, or that she could think of no arguments against the death penalty or for life imprisonment.

On re-cross-examination, counsel for appellant asked Murdock again if her feelings about parole would affect her answers to the special issues. Again, she said that they would: "I still feel strongly on that, yes." The trial court interrupted, "I don't think the law is that she must put it out of the back of her mind, or put it out of her mind. I believe the law is that it is whether or not she will consider it in answering these, or will she follow the oath that she took." After the colloquy with the trial judge, and in response to questions from that judge, Murdock said that she could follow

[17] XVIII R.R. at 84.

[18] XVIII R.R. at 84–86.

[19] XVIII R.R. at 86–91.

her oath.[20]  Counsel for appellant challenged Murdock for cause.  The trial court noted that "there was some confusion by the juror,"[21] but found her qualified and denied the challenge.[22]  Appellant used a peremptory challenge to remove Murdock from the jury.

Everyone has biases.  Jury questionnaires are designed to reveal those biases.  Voir dire is an opportunity to more fully explore them.  Some biases may be based on a misunderstanding of the law.  Murdock displayed some such biases, such as requiring the defendant to testify and show remorse and placing the burden on the defendant to prove that he would not be a danger in the future.  These misunderstandings were addressed in her voir dire, and her understanding of the law as to those issues was corrected.

Other biases, however, are not so easily overcome.  On some issues, Murdock's opinion did not change.  She continued to state that the proper punishment for any murder is a death sentence.  *See Morgan*, 504 U.S. at 735 ("[T]he [prospective juror's] belief that death should be imposed *ipso facto* upon conviction of a capital offense reflects directly on that individual's inability to follow the law.")  At the end of her voir dire, when asked if her feelings about parole would affect her answers to the special issues, she still said that they would: "I still feel strongly on that, yes."[23]  Her clear answer to that question belies her response to the trial judge that she could follow her oath.  Murdock

---

[20]  XVIII R.R. at 93–94.

[21]  As to some issues, the record reflects that Murdock was not so much confused as tending to agree with whomever spoke to her last.

[22]  XVIII R.R. at 97.

[23]  XVIII R.R. at 93.

is the sort of juror described by the United States Supreme Court in *Morgan*:[24] she could, in good conscience, swear to uphold the law, yet be unaware that maintaining her dogmatic beliefs about the death penalty would prevent her from actually doing so. *See id*. at 735, 736 n.9 (giving example of prospective juror who denied having any "prefixed ideas" about the case, affirmed that she would follow the law that the court gave her, but also stated that she could not vote for a death penalty). I would find that, under *Morgan*, Murdock was not qualified to serve as a juror in this case and that the trial court erred in overruling the challenge for cause.

In his third point of error, appellant complains of the trial court's failure to grant a challenge for cause against Randall Phillips. On his questionnaire, Phillips had indicated a belief that any and all defendants convicted of murder should receive the death penalty. The state pursued that issue.

> Q: But at least as of the time you turned in your questionnaire, your opinion was people convicted of murder should do life, life in prison, depending on the circumstances, or the death penalty.
>
> A: That would be correct. That is how I feel today.
>
> . . .
>
> Q: My reading on what you have written here is that, at least at the time that you filled this out, your impression is that defendants get kind of more breaks than they are entitled to, that they are not treated the way you would rather them be treated if you were kind of in charge of the justice system. Is that a fair interpretation of your feelings about that or–
>
> A. I believe in general overall what I would say is that–I think what I meant by that was that when someone is convicted of murder, knowingly, intentionally committing murder, that the big problem I have–and this is probably not the answer you are looking for–as far as the death sentence, I think they sit on death row far too long.
>
> . . .

---

[24] "It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so." *Id*. at 735.

Q. One of your questions was, a defendant should be found guilty if eleven out of twelve jurors vote guilty. You said you agree with that. But then you also said, courts are too concerned with the rights of criminals. You also agreed with that. . . . But you also feel like there are, I guess at least circumstances where criminals' rights tend to override what your sense of justice would be?

A. That is correct.

Q. So I want to ask you about question number 109. That is on page 20. It asks you to check the statement which best summarizes your views about the special issues, and it looked to me like you initially picked, the special issues will allow some defendants who deserve the death penalty to avoid that sentence, but you crossed that out and checked, I believe anyone convicted of capital murder should be sentenced to death, regardless of the answers to the special issue. . . . Do you still agree that anyone convicted of capital murder should receive the death penalty, or do you think that the special issues are–limit that in a way that is proper, or what do you think?

A. When it comes to capital murder, I think that I will stick with my answer.[25]

The prosecutor explained that the jury would be instructed that it needed to give "proper consideration" to the special issues and that it should not answer the special issues with "an eye towards achieving a certain punishment." Phillips said that he could follow that instruction, and the prosecutor continued.

Q. Should the defendant have any concern that you are going to be looking at this case with an eye towards getting a death penalty and not reviewing the evidence with an eye towards rendering a true and impartial verdict?

A. Right.

Q. Should the defendant be concerned about that or is that something that you can promise us you are not out to get the death penalty, you are out to answer these questions properly?

A. Yes, sir, that is correct.[26]

---

[25] XXI R.R. at 200–01.

[26] XXI R.R. at 202.

Phillips's response to the first question did not answer it. The only appropriate answers were yes (he should have a concern that I would be fair) or no (he should not be concerned). Nor, because the prosecutor's second question encompassed opposite, incompatible positions, did Phillips's response answer the second question. The prosecutor did not seek to clarify either of Phillips's answers.

The prosecutor continued his questioning, touching on life with parole, which applies to this case, future dangerousness and the burden of proving it, and the difference between possibility and probability. He then questioned Phillips about mitigation.

> Q. Number 138. It says, the defendant's background, criminal history, age, mental state and other factors should be considered by a juror in making a decision about whether to choose life in prison or the death penalty, and you put you strongly disagree. Now, that opinion you can see would be kind of the opposite of what the Court will instruct you to do with this mitigation question. So is that–and if that is your honest opinion, I won't argue with you but I need to ask you whether or not you can set that aside, or is that not your opinion, or how do you feel about this special issue?
>
> A. Well, I still wouldn't change my answer but I would still act within the guidelines of the law and the court.[27]

The prosecutor responded with the standard rehabilitating questions, received the correct responses, and passed the potential juror.[28] Defense counsel began questioning with Phillips's strong

---

[27] XXI R.R. at 209.

[28]

> Q. Okay. I think that is consistent with your other answers but I want to make sure I understand. You disagree with the idea that these kinds of [mitigating] circumstances ought to be considered. But if the court instructs you to consider them, you will and you will consider them fairly and impartially?
>
> A. That's correct.
>
> Q. And despite your strong feelings that they shouldn't necessarily make a difference, you are open to the possibility that they may cause you to vote for a life sentence if you feel like those

(continued...)

support of the death penalty.

> Q. And on Question 109, you said, I believe anyone convicted of capital murder should be sentenced to death regardless of the answers to the special issues. And I believe–is that the one you told Mr. Mau just now that you would still stay with that answer?
>
> A. Yes.[29]

This answer directly negates the answers Phillips gave to the prosecutor as to his ability to consider mitigation evidence fairly and impartially.

Defense counsel then asked about Phillips's responses to questions about arguments for and against the death penalty.

> Q. [Question] 114 asked the best argument for the death penalty and you indicated, we would lessen prison overcrowding by issuing an appropriate punishment. And then on question 117, what is the best argument against life? And you said again, an eye for an eye and prison overcrowding.
> In your opinion, should that be kind of a consideration in the application of the death penalty? ... I don't mean this to sound crass but kind of cull people out every once in awhile to keep the prison population down?
>
> A. I think you are mostly right. What I meant by my answer was if someone has been sentenced to death, don't wait 15, 20 years to carry out that sentence. I can't understand that.
>
> Q. And in your opinion, the death penalty is not used enough in Texas. Tell us how you feel about that.
>
> A. Well, just from hearing about cases where in my opinion the death sentence should have been used, some of those cases may be where the defendant claimed insanity or was under the influence of some kind of drug and they weren't found

---

[28](...continued)
mitigating circumstances are there?

A. Yes.

XXI R.R. at 210.

[29] XXI R.R. at 212–13.

guilty, just outright guilty of the crime, they consider the circumstances.[30]

. . .

Q. [O]ne of the things that concerns me is, it concerns me very much is page 12, question 70, list three people you least admire and why, and you put Adolph Hitler, number one, John Wayne Gacy, number two, which was, I think he was the fellow who killed a bunch of little boys, he was a mass murderer; correct?

A. Yes.

Q. And number three is Michael D. Gonzales?

A. Yes.

Q. This Michael D. Gonzales?

A. Yes.

Q. So I guess my concern is do you really feel, having put that down on the questionnaire, that you are the right person to serve as a juror in this case? That is, can you be a fair and impartial juror, having specifically listed–and you understand my concerns as his lawyer?

A. Yes.

. . .

Q. That answer in my mind calls into question your ability to listen to this evidence, no matter how hard you might try or how you might hope that you could listen to the evidence. I worry that given your response, which is not having one of those before, might mean that you would not be a fair and impartial juror in this case. Tell me how you feel about that.

A. Well, I have been sitting here thinking about this and after the answers that I have given to the other attorney, I want to be fair. I have never been put in a position like this. I don't want to be in this position, but I will be if I am called upon. But to sum it up, I came into this thing thinking life in prison was not enough, and although I still would want to be fair if placed over here in this jury I would be–I would try to be as fair as I can, but to be honest with both of you, I mean, everyone in this room, I really can't sit here and still, even now after this half hour, think that life in prison would

---

[30] XXI R.R. at 214.

be enough. I won't apologize for that. That is just my opinion and I'm sorry if I am going back on what I said. I would still be fair. I don't want to be put in this position but that is really my opinion.

Q. All right. Well, it is obviously a heartfelt [sic], and I appreciate that. I am moved by your disclosure now. But at the end of all this, the jurors who have to sit on this case have to be able to shake hands with their own conscience. We need to know if you can't be fair, and I think you told us that you fear you cannot. Is that right?

A. That I can't?

Q. That you can't be fair and impartial in this case.

A. Well, I feel like I would want to be and I would be. But what I am trying to say is, I have already got a preconceived notion in my mind how I want the outcome to be and it would not be fair.

Q. And you fear that that would affect the way you would answer these questions?

A. Yes.[31]

The prosecutor continued the discussion.

Q. I don't want to belabor the point, sir. I just want to make sure–I am not trying to get you to change your answer but I want to make sure I understand. We talked earlier this morning about the difference between what your opinion is, the way you might want the case to come out and then your duties to follow the law. Am I correct that now you are saying that you do not think you would be able to comply with your oath if you were–if you think you can, you need to let us know that but, I mean, I think a lot of people feel like that if you commit a capital murder, you probably deserve the death penalty. Some of those people say, I can keep an open mind, listen to all the evidence and answer these questions and I will answer them the way that the evidence shows regardless of how I want the case to come out. If you are the kind of person that thinks I don't think I can do that, I think I am going to answer these questions so that it comes out the way I want, then obviously you are telling us you can't–you can't comply with the evidence. I don't want you to feel like I am trying to shame you into answering the question differently because I am not. I am trying to make sure that you are telling us that your feelings are so strong that you just do not think that you can comply with the oath that the judge would give you to render a true verdict based on the law and the evidence and only that, not your preconceived notions.

---

[31] XXI R.R. at 215–18.

A. I'll comply with the oath and with the law and the laws of this court, but what I am telling you is, and I think you kind of hit on it there just a second ago, I would do my–what was called on me to do as a juror in this case, but, as you said, in the end if it didn't go the way that I wanted it to go I have got a preconceived idea of where I want it to go and I don't think that is fair, although I would still comply with the law and the oath.[32]

Defense counsel explained the state's burden on the special issue on future dangerousness and asked Phillips about his feelings on that special issue.

Q. . . .Well, let me ask you this. You have–you know how the special issues work now. The State must prove that there is a probability that he will be a future danger. And you have to find, in order to answer yes, you have to find that he would be a probable future danger beyond a reasonable doubt. If you don't find beyond a reasonable doubt, you would have to answer no. And if you did answer no, then life, capital life. Okay? If the prosecutor presented you some amount of evidence of future danger but that did not in your mind rise to the level of proof beyond a reasonable doubt. Okay? Could you answer this special issue no? Or would you answer it yes unless and until you heard the defense present some evidence that he was not a future danger?

A. I don't know. I am leaning toward answering your question no, that I could not–I am leaning toward–I am not leaning toward capital life, to answer your question.

Q. All right.

A. If you asked me if the attorney could present me with enough, you know, mitigating circumstances to lean toward capital life; right, is that what you are asking?

Q. Well, no, we are up here on the future danger issue right now, the first one.

A. Right, I understand.

Q. That is the one that they have to prove beyond a reasonable doubt, that there is a probability of future danger. All right? And my question is if you thought they would present you with some evidence, maybe even a significant amount of evidence, but not in your mind evidence beyond a reasonable doubt, could you answer this special issue no, that you did not find future danger beyond a reasonable doubt? Or would you answer it yes, even though it wasn't proof beyond a reasonable

---

[32] XXI R.R. at 218–19.

17

doubt in your mind unless and until–would the defense have to come present evidence to you that Mr. Gonzales was not a future danger? Do you understand what I am saying there?

A. I believe I do and I believe my answer would have to be yes.

Q. That he would be a future danger?

A. Yes, sir.

Q. Unless Mr. Gonzales presented some evidence to you that he was not a future danger?

A. Yes, that is correct, and would be something that I would listen to and consider.

Q. I want to make sure I am understanding you. You would want–you would require the defense to bring some evidence that he was not a future danger in order to answer this issue no?

A. That's correct.

Q. Even if the State had not proved to you future danger beyond a reasonable doubt?

A. Yes, that is correct.[33]

The prosecutor continued the questions on future dangerousness, and Phillips changed his

answer.[34] Defense counsel challenged Phillips for cause, asserting that

> he has acknowledged he cannot be a fair and impartial juror. . . . He has said on his questionnaire that he believes a hundred percent in an eye for an eye. He strongly favors, the highest answer you can give, the death penalty. He believes that we are too lenient on criminals. He believes the death penalty is appropriate in every murder case. He strongly disagrees that a person's background is something that should be considered. . . . The worst thing about it is that he specifically noted that one of the three people that he admired least, first was Adolph Hitler, second was John Wayne Gacy, and third was this particular defendant, Your Honor. It reveals a prejudgment in this case. He has told us that he has prejudged the case. He . . . worries that his feelings will affect the answers to the questions. He says he has a preconceived idea

---

[33] XXI R.R. at 223–25.

[34] XXI R.R. at 225–26.

of where he wants the case to go. . . . He said he wanted to be fair but life in prison was not enough. And . . . in this situation, it is just too dangerous to allow a person of his mindset on this jury. And so we would challenge him for cause on the grounds that he has told us that he cannot be a fair and impartial juror in this case, Your Honor.[35]

The prosecutor responded that, although Phillips acknowledged his strong feelings about the death penalty and about this case, he nevertheless affirmed that he would set his feelings aside and follow the court's instructions. The trial judge overruled the challenge, and defense counsel exercised a peremptory challenge.[36]

Despite changing his responses to some issues, depending on the questioner, Phillips never changed his position that he had a preconceived idea of how the trial should come out or that he feared that the preconception would affect his answers to the special issues. Nor did he back away from his opinion that anyone who was convicted of capital murder should receive the death penalty. *See Morgan,* 504 U.S. at 735 ("[T]he [prospective juror's] belief that death should be imposed *ipso facto* upon conviction of a capital offense reflects directly on that individual's inability to follow the law."). He also affirmed to both the prosecutor and defense counsel that he strongly disagreed that a defendant's background, criminal history, age, mental state and other factors should be considered in deciding between life and death.

A person who continues to strongly disagree that mitigating factors should be considered cannot act within the guidelines of the law and the court. *Id*. at 739 (any juror to whom mitigating factors are irrelevant should be disqualified for cause). Phillips is the sort of juror described by the United States Supreme Court in *Morgan*: he represented, in good conscience, that he could swear

---

[35] XXI R.R. at 229–30.

[36] XXI R.R. at 232.

to uphold the law and be fair, yet was unaware that his dogmatic beliefs about the death penalty would prevent him from actually doing so. *See id*. at 735. I would find that, under *Morgan*, Phillips was not qualified to serve as a juror in this case and that the trial court erred in overruling the challenge for cause.

Appellant challenged two prospective jurors. Because he received an additional peremptory strike, he must demonstrate that both challenged prospective jurors should have been struck for cause. I would find that he has done so and is therefore entitled to a new punishment hearing. Because this Court upholds the rulings of the trial court as to these two challenged jurors and thereby denies appellant that hearing, I dissent.

Filed: September 28, 2011
Publish